## FULLER BRUSH CO. v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 6163.   Decided July 12, 1940.   (104 P. 2d 201.)

*Cheney, Jensen, Marr & Wilkins*, of Salt Lake City, for plaintiff.

*A. N. Ferro*, of Salt Lake City, *Joseph Chez*, Atty. Gen., and *S. D. Huffaker*, Asst. Atty. Gen., for defendants.

LARSON, Justice.

This is an original proceeding to review a decision of the Industrial Commission of Utah holding in effect that the defendant, Lamont Holst, was an employee of the Fuller Brush Company, and affirming an order of Floyd T. Atkin, Appeals Examiner of the Unemployment Compensation Division of the Industrial Commission directing the Fuller Brush Company "to file a wage and separation report and pay into the Utah Unemployment Compensation Fund the

necessary contributions on wages earned by the claimant while in the company's employ."

The plaintiff presents two questions: (1) Is the order of the Industrial Commission, or its employees, directing plaintiff to pay "contributions" into the Utah Unemployment Compensation Fund, valid and binding? (2) Was the legal relationship between plaintiff and defendant Holst that of vendor and vendee or that of employer and employee? We consider them in order.

(1) In the recent cases of *Logan-Cache Knitting Mills* v. *Industrial Commission and Charles F. Hull*, 99 Utah 1, 102 P. 2d 495, and *National Tunnel & Mines* v. *Industrial Commission and Hartle*, 99 Utah 39, 102 P. 2d 508, this court held that orders to pay contributions into the Unemployment Compensation Fund must issue from the State Tax Commission and not from the Industrial Commission. The order of the Industrial Commission directing plaintiff to pay into the Unemployment Compensation Fund the necessary contributions on wages earned by the claimant while in the employ of plaintiff is without validity.

(2) We come now to the second question presented by the record,—as to whether defendant, Lamont Holst, was an employee of the plaintiff, that is did he perform personal service for wages under the terms of the act, and if so, is he excluded from the provisions of the act by virtue of subheads 5 or 6 of subdivision (j) of Sec. 19 of the act, Laws 1936, Sp. Sess., c. 1, as amended by Laws 1937, c. 43? Plaintiff contends that the relationship between it and Holst was that of vendor and vendee and not that of employer and employee, while defendants argue the relationship, although in form one of vendor and vendee, was in fact a relationship of employment for wages. Both counsel have vigorously presented their positions, the argument centering on the meaning of Sec. 19 (j) (5). An analysis of the act discloses that the answer to this question is not found in that section, since the question as to whether the relationship is

one of employment within the act must be answered before Sec. 19(j) (5) comes into the picture at all. Let us examine the act briefly.

The act is one to provide for payment of benefits to individuals who are unemployed through no fault of their own, and otherwise eligible for benefits. Secs. 2 and 3. Such benefits are computed on the individual's latest weekly wage. Sec. 3. Sec. 4, entitled "Benefit Eligibility Conditions," emphasizes claimant must have been employed, is now unemployed, and earned wages for employment. To like effect is Sec. 7 which provides for payment of contributions "with respect to wages payable for employment." We refer to these matters to emphasize that the act only applies to and covers individuals who are in employment for wages. The act does not cover every status of employment, nor does it cover every individual who receives from another remuneration for work done. It covers only individuals who have been, or are in employment and who receive therefor wages as those two terms are defined in the act. *Globe Grain & Milling Co.* v. *Industrial Commission et al.,* 98 Utah 36, 91 P. 2d 512; *Roberts* v. *Industrial Commission,* 97 Utah 434, 93 P. 2d 494; *Logan-Cache Knitting Mills* v. *Industrial Comm. and Charles F. Hull,* supra; *National Tunnel & Mines Company* v. *Industrial Comm. and Alton Hartle,* supra; *Salt Lake Tribune Publishing Co.* v. *Industrial Comm. and Lynn Clark Cushing,* 99 Utah 259, 102 P. 2d 307; *Creameries of America, Inc.* v. *Industrial Comm. and Robert L. Foss,* 98 Utah 571, 102 P. 2d 300. "Employment" is defined as service performed for wages or under any contract of hire. "Wages" is defined as all remuneration payable for personal services, including commissions, bonuses, and gratuities customarily incident to the course of employment, whether received in cash or other medium. Sec. 19(j) (1), and (p). The first question therefore to be determined, when a claimant applies for benefit payments, or when the question arises as to whether a particular individual should be included on a payroll report for purposes of determining

the amount of contributions to be paid is: Has this individual rendered personal service for wages or under a contract of hire? In other words, did he render personal services? If so, did he, or was he entitled to receive therefor remuneration based upon such personal service? If both these questions be answered in the affirmative, then he is within the act, unless excluded by subheads 5 or 6 of subdivision (j) of Sec. 19. If either of these questions be answered in the negative, such person is not within the act. If the questions last above set forth be answered affirmatively, then the inquiry must be made as to exclusion by subheads 5 or 6. Subhead 6 excludes public service, agricultural service, domestic service and certain other definitely specified types of personal employments. They all constitute personal service normally rendered for wages, or under a contract of hire, and except for the language of subhead 6 would be employment within the act. Subhead 5 excepts from the operation of the act another kind of personal service rendered for wages. It is such service as (a) leaves the individual performing it "* * * free from control or direction over the performance of such services, both under his contract of service and in fact"; and (b) is outside the usual course of the employer's business, or performed outside the place of business of the employer; and (c) is performed by an individual who "is customarily engaged in an independently established trade, occupation, profession or business." But these three factors are not given for the purpose of determining whether a certain labor performed or service rendered, comes within the term "employment" as used in the act, nor for determining whether such labor or service is performed for "wages" as used in the act. Subhead 5 applies only to cases, where it has been previously determined, where the work or service comes within the term "employment" as defined in the act, and that it was performed for "wages or under a contract of hire." Until it has been so determined subhead 5 has no application. These conditions indicate a legislative intent to make an exception, to eliminate from the operation of

the act certain kinds of personal service in private industry rendered for wages, but which could not well be defined by a single work or class designation like those in subdivision 6. A few illustrations will make clear the purpose and meaning of the three factors. A takes to the blacksmith a horse to be shod and a plow point to be sharpened. The smith renders personal service and receives remuneration for his time and labor, which constitutes wages under the act. But it was not contemplated that A should pay contributions on the money paid the blacksmith, nor that the smith should be eligible for benefit compensations under the act as now written. The blacksmith performs his task of shoeing the horse and sharpening the plow point according to his own methods and ideas without direction or control from A, who may leave the shop while the work is done, relying and depending upon the smith's superior knowledge and ability. The work is done away from all places of business of A,—and the smith is customarily engaged in an independently established trade, to wit, blacksmithing. Other illustrations are the shoe shiner; the auto-mechanic who repairs or overhauls a car; the dentist; the butcher who cuts up the deer the hunter brings in; the plumber who cleans out the drains and perhaps replaces parts of the plumbing; the C. P. A. who comes in and audits the books; and the barber who cuts the hair, gives a shave, massage and shampoo; and the surgeon performing an operation on the patient. In these simple illustrations, such people all render personal service for a remuneration, but they are free from control in the doing of the service, that is, they are their own bosses as to how they do it; they perform services outside the employer's place of business, or outside the usual course of his business, and they are all customarily engaged in an independently established trade, business or profession.

Much has been said in the briefs and arguments in this case as to the meaning of part (c) of subhead 5. The decision of the Appeal Tribunal, and therefore of the Industrial Commission, was based upon that factor, their finding being that claimant had not, prior to his work for plain-

tiff been customarily engaged in selling goods to the public. It apparently construed the provision for the purpose of this case to mean that it must be shown that claimant, prior to the service upon which this action is based, and during the time of such service, had been engaged in the business of rendering the same kind of service to other parties. Plaintiff contends that the provision refers wholly to the service involved, and argues that if in rendering such service, claimant was acting for himself he was engaged in a business of his own, and therefore during such employment was customarily engaged in an independently established business. The difficulty with this position is that it ignores entirely the significance of the words "customarily" and "independently." The statute does not say, as the Colorado court read it in *Industrial Comm.* v. *Northwestern Mutual Life Ins. Co.*, 103 Colo. 550, 88 P. 2d 560, "independently engaged in an established business," nor does it read as plaintiff's interpretation would make it read: "that he was customarily engaged in an independent business." The adverb "independently" clearly modifies the word "established," and must therefore carry the meaning that the "business" or "trade" was established independently of the employer or the rendering of the personal service forming the basis of the claim. And in the exclusion clauses (j) (5), or perhaps more correctly the clauses making the exceptions from the general inclusion of all persons rendering personal service for wages, the present tense "is" indicates the employee must be engaged in such independent business at the time of rendering the service involved. "Customarily" means usually, habitually, according to the customs, general practice or usual order of things, regularly. We think it clear without further discussion why these exceptions, exemptions or exclusion provisions were written and what they mean, and why the legislature intended to except such rendering of personal services for wages from the operation and effect of the act.

Let us examine the record and determine whether under the admitted facts it can be said as a matter of law that

claimant Holst did not perform personal services for plaintiff and receive, or was entitled to receive wages therefor. The question as to whether one performing personal services is performing them for another or for himself usually offers no difficulty. In a few borderline cases, where services for another and for self may overlap, or where an artificial relationship may be set up between the parties some difficulty may be encountered. It may be stated that services are performed for another when performed under his supervision, direction and control, in the performance of the details of the work and in the use of the means employed; (*Texas Co.* v. *Wheeless*, 185 Miss. 799, 187 So. 880), when he has the right to hire (select the worker) and the right to fire (terminate the employment) and when the compensation, if any, accruing to the worker becomes a direct liability on the other party. But all these are not always present, and if present they may not be evident on a casual examination. Under some of the recent labor legislation, the right to hire and fire has been much limited. The right to determine and fix the compensation of the worker is indicative, although under many wage laws the compensation is fixed by law or by an administrative body, or may be determined by a contract between the employer and a third party.

But it is not all personal service performed for another that comes within the act, but only such as is performed "for wages or under any contract of hire." "Wages" is defined as all compensation payable for personal services, rendered for another under a contract of hire, express or implied. This compensation is based upon and computed upon service rendered, and is not derived from the accomplishment of a purpose or achievement of an objective, by the person receiving the remuneration, through a difference in two prices. The essential elements of wages are that they form a direct obligation against the employer, in favor of the employee; that when the service is performed the compensation, if any, accrues and becomes payable regardless of

the success or failure of the undertaking; that any profits or earning over and above costs of the service accrues to the employer, and any loss as a result of the undertaking or service must be borne by the employer. It is not essential that the wage move directly from the employer to the employee, as where the employee works on commissions, deducts his commission from a collection and remits the "nets," but it is essential that the remuneration accrues from the product or service of the employer, and would accrue to him except for the fact that the employee is entitled to retain or receive it as remuneration under his contract of hire. The term "contract of hire" is not defined in the act probably because the legislature felt that the expression was so well established, understood and definite, that it needs no further amplification or exposition. It is used in its common meaning and acceptation. It is an agreement whereby one undertakes or obligates himself to render personal service for another for a remuneration to be paid because of the service was rendered, regardless of the element of profit or loss resulting from the work, endeavor, or undertaking.

A brief statement of the salient facts becomes necessary. Plaintiff is a corporation engaged in the manufacture and sale of brushes. The selling policy of plaintiff is not to sell through brokers, jobbers, and stores, but to enter into written contracts with individuals as dealers, who have a territory assigned to them and in which they effectuate their sales by calling directly at the homes of the people. They were supplied with a sample case of brushes, which was charged or leased to them, and which they could pay for and keep or return for credit upon termination of the contract as dealer. All goods were sold to the dealer for cash and by him resold to purchasers at an advanced price. If a dealer were unable to pay cash he was allowed credit for one weekly order of brushes, provided he first furnished a credit bond or undertaking in the sum of $200 to insure payment. The company suggested retail prices for the various articles but the dealer was not required to adhere thereto. The dealer

set his own hours of work, the order of work, and methods of work. He made no work reports to the company and received no orders or directions from it. He made no reports of sales, furnished the company no list of his customers or record of his accounts with them. Any good will he built up was his own and not the company's. He could sell for cash or credit without knowledge of the company, and upon termination of his contract gave the company nothing except payment for the merchandise he had received. A new dealer in the territory had to build his own business, find his own customers, and begin all over again without any knowledge of the business done by his predecessor in the territory. All the elements pointed out in the Creameries of America case and the Salt Lake Tribune case, supra, as evidencing the fact that the relationship was one of employment, are lacking in this case. The appeal tribunal and the Industrial Commission found specifically that Holst was free from all direction and control over the performance of his services, both under his contract and in fact; and that his services were performed outside the places of business of the company, but found that he received wages in the nature of commissions. Putting it briefly, they found that claimant performed personal service, that he received wages in the nature of commissions from plaintiff, and therefore such personal services must have been rendered for plaintiff. That claimant performed personal service is not in dispute, but there is a dispute as to whether such services were performed for plaintiff or for self, and as to whether he received wages therefor or profits on sales. In other words, was the relationship between plaintiff and claimant that of employer and employee or that of vendor and vendee? The finding being positive and definite that claimant in the performance of the personal service was free of all direction and control by plaintiff, both in fact and under his contract of hire, it must follow of necessity that he did not perform service for plaintiff under a contract of hire or for wages, and therefore the relationship was one that never came within the scope of the act because he was not in employment that would bring him

within the act, to wit, rendering personal service for another under a contract of hire or for wages. Since there was no obligation on plaintiff to pay claimant any remuneration for services, but claimant must get his remuneration, if any, from his ability to sell the brushes at an advanced price over the cost to him and that he and not plaintiff assumed the risk of profit or loss on the venture or undertaking, it follows claimant's services were not rendered for wages or under a contract of hire. The error came about through a misinterpretation of the law, in holding that all personal services were within the act unless excluded by the provisions of Sec. 19 (j) (5),—whereas only those personal services are within the act which are rendered for another for wages or under a contract of hire. As pointed out above, Sec. 19 (j) (5) is an exception provision, applying only after it has been determined that personal services were rendered for another for wages or under a contract of hire. It excepts from this class certain instances in which the three conditions of that section all are present.

Since claimant never came within the act as rendering personal service for another for wages or under a contract of hire, it is unnecessary to consider whether he was customarily engaged in an independently established business.

The orders of the Appeal Tribunal and the Industrial Commission are annulled, vacated and set aside.

MOFFAT, C. J., concurs.

McDONOUGH, Justice (concurring in the result).

I concur in the result. However, I agree with the analysis of the act made by Mr. Justice WOLFE in his dissenting opinion. Nevertheless, under the evidence, which is not conflicting, I am of the opinion that the relationship between claimant and plaintiff was a non-service one.

PRATT, Justice (concurring in the result).

I concur in the reasoning and conclusion to the effect that the contractual relationship here is not one coming within

the terms of the act. I concur in the result. As to the other matters discussed in the decision I refer to my opinion filed in the Logan-Cache Knitting Mills case, 99 Utah 1, 102 P. 2d 495.

WOLFE, Justice (dissenting).

I dissent. While the order to pay contributions into the Unemployment Compensation Fund was one which the employer was not compelled to obey because under Sec. 14, Laws of Utah 1936, Sp. Sess., c. 1, the Tax Commission has the duty to demand and collect contributions, it can be considered in the nature of a conclusion from the findings that the employer is one required under the act to contribute, and so construed may have some function as evidence in a proceeding by the Tax Commission to collect the contribution. At the most it is surplusage. I have stated my views in regard to this matter more fully in my opinion filed in the case of *National Tunnel & Mines Co.* v. *Industrial Comm. of Utah*, 99 Utah 39, 102 P. 2d 508.

For further treatment of the question of a finding of one agency being a fact adjudicated for purposes of collection by another agency, see *Sunshine Anthracite Coal Company* v. *Adkins*, 60 S. Ct. 907, at page 916, 84 L. Ed. 825.

I cannot agree with the conclusion of the opinion as to the second question presented. I think the evidence sufficient to sustain a finding by the Commission that the relationship between the plaintiff and Holst was in part a representative one rather than one of vendor and vendee, or, to put it according to the classification laid down in Sec. 19(j) (1), the relationship was a service rather than a nonservice relationship. This is one line which separates those subject to the act from those not subject to the act, in so far as the inclusion-exclusion test for relationship is concerned. I have in my opinion filed in the case of *Logan-Cache Knitting Mills* v. *Industrial Comm.*, 99 Utah 1, 102 P. 2d 495 at 502, set out the three hierarchy of inclusion-exclusion tests under the act. The one regarding relationship

requires first, a determination between a service and a non-service relationship. If it is a service relationship it comes under the act, although it may be excluded by ensuing tests under the same hierarchy—for instance, under Sec. 19(j) (5)—(a), (b), and (c). But the first question under Sec. 19(j) (1) is whether it is a service or non-service relationship. And as to that question every "service performed for a remuneration whether that remuneration is a commission, a bonus and a gratuity or whether received in cash or other medium," constitutes a relationship which passes the test of Sec. 19(j) (1). Of course, not all of such relationships will entitle the one receiving the remuneration for the service to qualify for unemployment compensation. He may be excluded because under 19(j) (5) (a), (b), and (c), his relationship is one which takes him out of those service relationships which entitled him to participate or the services may not be of sufficient duration or amount under Sec. 4(e) of the act. But any services for "wages," as "wages" is defined by Sec. 19 (p), however small, constitute a service relationship as distinguished from a non-service relationship. However, it must be a service relationship and it must be services performed for wages.

True vendor-vendee or a lessee-lessor relationships are not service relationships. They fall in the non-service category. Not the only test of a vendor-vendee or lessor-lessee relationship is the contract executed between the parties. This may in *words* and *form* meet the tests of a vendor-vendee contract rather than a service contract, but facts aliunde of the contract may be taken into consideration to determine the real relationship between the parties. And this relationship for purposes of determining whether the applicant may participate in the fund and whether the other party to the relationship was an "employer" of the applicant, must be viewed in connection with the act and the purposes which it is to serve. This is not to say that what is not a service relationship under tests applicable, had this act never been passed, will become a service relationship because of the act. What is meant to be said is that the Commission and this

court will look behind the mere form of the relationship to determine what it actually is and not what it is called. If the relationship was to all intents and purposes one for the rendering of services by one party to another, the fact that it may assume the legal habiliments of another type of contract will not avail to defeat the applicant's right to share in the fund. This I understand to be the real meaning of *National Tunnel & Mines* v. *Industrial Comm.*, supra. The act was meant to cushion unemployment treated as an incident to the service relationship of employment. This objective was not only for the welfare of the individual entitled, but for the benefit of society. The individual needing work is in most cases required to contract in the manner which he who has the job to offer may desire. And if the net result of that contract is to provide what would ordinarily be a service performed for employer, it will be looked at in fact as indeed it is—as creating a service relationship.

What are the facts and circumstances surrounding this relationship? The sample case of brushes was charged to the so-called "dealer," but was returnable and credit given for the same. This is exactly the same procedure that is used by many employers to insure responsibility of their salesmen for samples furnished. The net result and the actual transaction is exactly the same whether the samples are loaned to the salesman and charged against him or a deposit required and credit given on return, or whether the transaction assumes the legal aspect of passing title to him for a payment or on credit, with a right to resell back to the "vendor" and to obtain back his payment or cancel the credit extended to him. The net result of this transaction is the same whatever legal form it assumes.

The goods "sold" by the "dealer" were sold to him for cash or on restricted credit, provided he furnished a bond to insure the credit. This has the aspect of a sale— a vendor-vendee transaction. He was not restricted to a selling price to the consumers but it was suggested to him.

We next come to the question of control. At the outset it must be kept in mind that we are now examining the record in respect to a determination of whether the relationship belongs in this service or non-service class under 19(j) (1). We are not yet concerned with the next test which occurs under 19(j) (5) (a), (b), and (c) which must be applied if we find the relationship under 19(j) (1) to be one of service for wages. At this phase of the examination, therefore, "control" is a one-way test. That is to say if there is control the relationship will be almost conclusively one of service rather one of non-service. We do not think of control in this sense applied to a lessor-lessee or vendee-vendor relationship. But on the other hand, lack of control or right to control does not necessarily make the relationship a non-service one. There are relationships in which the element of control is not present yet which under 19(j) (1) fall under the service rather than the non-service category. While the Act purposely avoids all reference to independent contractors because such nomenclature belongs in the field of tort, yet such relationship furnishes an example of one of service which under 19(j) (5), (a), (b) and (c) may or may not fall out of the operation of the act. Hence, in the case of testing under 19(j) (1), if we discover there is control, such element is fairly conclusive. If there is no control the examination must proceed. The main opinion in this respect is confusing and in error. The court says:

"The finding [of lack of control] being positive and definite that claimant in the performance of the personal service was free of all direction and control by plaintiff, both in fact and under his contract of hire, it must follow of necessity that he did not perform service for plaintiff under a contract of hire or for wages, and therefore the relationship was one that *never came within the scope of the Act* because he was not in employment that would bring him within the Act, to wit, rendering personal services for another under a contract of hire or for wages." (Italics added.)

This test is one under Sec. 19(j) (5) (a) and it was in that regard that the commission found it. But since Sec. 19(j) (5) (c) prevented the claimant from being excluded

he was still in. I think the opinion has misconceived the processes applied by the Commission. It states:

"The error came about through a misinterpretation of the law in holding that all personal services were within the Act unless excluded by the provisions of Sec. 19(j) (5),—whereas only those * * * services are within the act which are rendered for another for wages or under a contract of hire."

It seems to me that the court, not the commission, has made the misinterpretation. The commission certainly had no idea, for instance, that a lessee cutting the grass on his leased premises was doing services other than for himself. And the commission correctly interpreted the act making the dividing line under Sec. 19(j) (1) one of a service and a non-service relationship, the service relationship, of course, being one for "wages" as defined by Sec. 19(p). The commission tried to test the relationship along the lines of whether the remuneration was a price paid by a purchaser or a wage paid by one for whom a service was performed. It did not make the error of thinking that all services, whether performed for another or for oneself came under Sec. 19(j) (1). It would be difficult, in the first place, in conceiving of a service *relationship* with oneself. The idea of relationship in respect to service involves the idea of performing services for or to another. The statute says "for" another because services may be performed "for" one, yet directed to another party. The boy that shakes up the malted milk or the conductor that assists a passenger off or on the car performs services "for" his employers but "to" the customers. I think this court misconceives the commission's action. It did not think that personal services other than for "wages" as defined by Sec. 19(p) brought the plaintiff under the act. It did not think that personal services for oneself brought the claimant under the act. It was struggling with exactly the same question that occupies this court, that is, was the relationship one for services for "wages," or was it a relationship which did not involve services *for another* but a wholesaler-retailer relationship?

As a matter of fact, the plaintiff did have a means of control of Holst's conduct. While it is true that no right of control over the hours, order or method of Holst's work was stated in the contract, a right by indirection was retained, through the provision that the contract could be terminated at will. Such was, in effect, a Damocles' sword hanging over the head of Holst. If he did not follow the "suggestions" contained in the printed booklet or the "advice" to attend meetings such right could be exercised without giving a reason. In such relationships by some subtle prevading manner, these "suggestions" and "advices" may easily become metamorphosed in the mind of the one who needs the job as "orders" and "instructions" emanating from the one in the advantaged position, that is, the one who has the job to give and to take away. But perhaps for the test under 19(j) (1) we should treat the matter as if control did not exist and if the relationship, nevertheless, falls into the service class, consider the above remarks applicable to our analysis when we come to consider 19 (j) (5), (a), (b), and (c). We proceed then with the examination of the evidence as to whether the relationship was a service or non-service one under 19(j) (1).

(1) Holst was selected by the company to be a "dealer." The Western States manager for the Fuller Company testified, "We don't take every Tom, Dick, and Harry that comes along and give him a territory * * * We are pretty sure a man is of good character and is a pretty good type of man before we agree to give him a territory." The duty of a branch manager is "to find the right type of men to appoint as 'dealer.' " A wholesaler doesn't customarily select the retailers to which it will sell in this manner. Ordinarily a retailer with cash or credit can buy goods at wholesale.

(2) Holst was assigned a territory "mutually agreed upon." His territory was changed by the field manager. A retailer is ordinarily free to select the territory in which we will sell. He is not assigned territory which is under the

supervision of another from whom he receives "instructions and suggestions."

(3) Holst was required to give a bond in lieu of a money deposit to protect the company. But the branch manager arranged the application for a bond which was on a printed form especially designed for Fuller Brush Dealers. Moreover, the language of the bond refers to the Fuller Brush Company as "employer" (Ex. D). Requiring a bond from one to whom sales are to be made on credit and bonding an employee are both common practices. This instance smacks more of the latter.

(4) Although Holst "purchased" the brushes which he sold and used for demonstration, the company agreed to "repurchase" them. (Ex. A. par. 4). And Holst did return brushes. (Ex. G). While a wholesaler may agree to repurchase from a retailer, it is not common. It appears that Holst was demonstrating company owned brushes on behalf of the company; not his own brushes on his own behalf. He was "loaned" a demonstration case full of brushes.

(5) Holst never maintained a stock of brushes from which he sold. He purchased no brushes before attempting to sell them. He ordered from the company only those brushes for which he had orders. He paid for said brushes the week following. This appears to be more consistent with employer-salesman than with a wholesale-retailer relationship.

(6) Holst and other dealers were under the jurisdiction of field and branch and division managers who "helped" them and made "suggestions." They were instructed and helped in methods of selling. They were "advised" but not compelled to attend sales meetings which were held every morning and once a week in the evening. Holst sent in a daily report (Ex. C). at "request" of the branch manager. The district manager "advised" that it wouldn't be good practice to sell other articles, although another "dealer" did sell shoes along with brushes. Holst was instructed to give

certain gift brushes. Certain prizes and premiums were given for most sales and most *demonstrations* by an individual dealer in a given time. And a bulletin for "dealers" in branch or district was printed by the company. Such organization, instruction, attempts to build morale, etc., connote and reflect more an integrated sales organization of the company rather than a wholesaler selling to scattered retailers. Under an agreement of "employment" which the company can terminate at will, a "suggestion" or "some advice" from a supervisor over a territory in all probability constitutes, in effect, an order to a "dealer" who wishes to keep his territory and to continue to sell Fuller brushes. It is also noteworthy that the sales organization acknowledgingly extended down to the last link, including the consumer and the plaintiff—that is, the so-called "dealer." The field and branch managers were paid representatives. The "dealer" as representative salesman would complete the entire organization as a sales organization for distribution of the product from the factory to the consumer. Certainly in door-to-door selling as distinguished from a store or fixed locale for a dealer such is the customary manner for manufacturers to operate when they sell directly to the public.

(7) Holst described himself as a "salesman and dealer." He sold under the Fuller name, not his own. The order blank signed by customers refers to a "Fuller Dealer" and his rendering "Fuller Service" (not his own) (Ex. B). Calls were sometimes made to the Salt Lake office on sales negotiated by "dealers." Throughout all dealings and activities the idea prevails that "dealers" are representatives of Fuller Brush Company selling for Fuller Brush Company. Only in the use of certain terms and to some extent in the method of remuneration does the idea creep in that these "dealers" are retailers operating on their own. Though supervision and regulation of "dealers" is said to be noncompulsory, realistically it is binding on "dealers" who want to get along in their work.

Something is said in the opinion about Holst not turning in or being required to turn in a list of his customers. The explanation why this was not done or required lies very near at hand. The nature of the business was such as to make such a list practically useless, even more useless than would be a list of promiscuous customers who dropped into a fixed place of business and bought brushes. A new man taking the territory would be compelled to make a house-to-house canvas whether or not he had a list of those in the district who previously bought because, where one sells to the housewife brushes or brooms which have only limited life, the salesman's contact must articulate somewhat with the termination of the life of the broom or brush. A list of customers no longer living in the neighborhood because of removal would do little good. Such goods are bought not by deliberate order from a house but largely because a salesman strikes the customer at the happy time. And any good will generated would accrue by virtue of the name Fuller Brush and not by the name of the dealer. If a housewive bought later from a store and ordered a Fuller Brush ordinarily it would be because the brush sold itself and not because a particular man sold it to her at the door. Moreover, it is doubtful whether in such hand-to-mouth business a list of customers would be of value even to the "dealer." On any particular trip he might find his old customers still supplied and attempt to pick up the "in-betweens."

While the situation presents a case in which it is possible to take divergent views as to the nature of the relationship in the examination required by Sec. 19 (j) (1), I think it must be held in fact to be a service relationship. And I thus conclude whether the question be a jurisdictional one in which we weigh the evidence or whether we ask ourselves whether there is any substantial evidence to support the inference of the commission. As to whether the fact is jurisdictional or non-jurisdictional, I need only refer the reader to the discussion contained in the opinions of Mr. Justice Pratt and myself in the case of *Logan-Cache Knitting Mills* v. *The Industrial Commission*, supra.

Having passed the test under 19(j) (1), I come to examine the question as to whether the commission erred under Sec. 19(j) (5), (a), (b), and (c). Again admonition is advanced that the test under 19(j) (1) and 19(j) (5), (a), (b), and (c) are separate and must not be confused. The main opinion recognizes this and yet appears to me, nevertheless, somewhat to confuse them.

We must conclude that the claimant was free of control under his contract, and in fact, as far as required by 19(j) (5), (a) because the commission so found and in this *regard* there is evidence to support it. But this court might still be free to consider whether there was control such as would be an element to determine whether the relationship was one of service under 19(j) (1), especially if as regards that question the evidence comes before us, as in equity cases, according to the idea of Mr. Justice PRATT that such fact is jurisdictional.

The plaintiff, therefore, should prevail as to Sec. 19(j) (5) (a) and (b). The plaintiff should not prevail as to clause 19(j) (5) (c) for the reasons given in the main opinion.

Sec. 19(j) (5) (c) assumes that the test of 19(j) (1) has been met so far as the claimant is concerned—that is, that the relationship is one of service for wages. It then presents the further question as to whether this service rendered is part of, and in pursuance of, a business of the claimant, independently established, in which claimant is customarily engaged, or whether the service relationship under consideration is one which stands alone as the claimant's real business? This does not mean to say that claimant may not have other sources of income from an occupation. He may, for instance, play in an orchestra for remuneration or have a few clients whose books he periodically audits. These would be side issues augmenting his income and in a sense make him engaged in another and independent business, but 19(j) (5) (c) presents the question of whether the claimant's relationship with the alleged employing unit is one in

which he is engaging as a pursuit of a general business independently established in which he is customarily engaged, or does it stand by itself as the *main* or only business of claimant? Most service relationships generating from a business independently established would present what is called in the nomenclature of torts an independent contractorship which is a division of the service relationships. Such illustrations given in the opinion—shoe shiner, auto mechanic, plumber and barber are in point where the purveyor of the services is in business and such services emanate as part of that business. The business exists independent of the services under consideration in the sense that it is the whole— of which the particular service is a part, or the independently established business may be entirely separate and unconnected with the particular service, yet constitute the main business at which claimant customarily works. That certainly was not the case with Holst.

To pose the question under Sec. 19(j) (5) (c) as one to determine whether Holst was in business as a retailer having with plaintiff a wholesaler-retailer relationship and, if thus found, determine that he was in an independently established business, is to transport into Sec. 19(j) (5) (c) a question which should already have been passed upon under Sec. 19(j) (1).

To give the facts presented in this case the aspect of a wholesaler-retailer relationship will open the way to disenfranchise from the benevolent purposes of the Act, large classes of what otherwise would be employees. And by this it is not meant to reflect on the Fuller Brush Company which had set up the relationship here presented long before passage of our Unemployment Compensation Act and which can in no wise be said to have created such relationship for the purpose of avoiding the effects of the Act. Nevertheless, when two interpretations are possible—one of which will serve the purposes of the Act and the other militate against them, we should adopt the former. Thus, I conclude that the Commission was correct in not exclud-

ing the relationship under Sec. 19(j) (1) nor under clauses of Sec. 19(j) (5) (a), (b), and (c) and hence, I must dissent.