1. Under section 19(f) of the unemployment compensation act of 1937, whenever any employing unit contracts with or has under it any contractor or subcontractor for any work which is part of its usual trade, occupation, profession, or business, unless the employing unit as well as each such contractor or subcontractor is an employer subject to the act by reason of other provisions, the employing unit shall for all purposes of the act be deemed to employ each individual in the employment of each such contractor or subcontractor for each day during which such individual is engaged in performing such work.
(a) In the instant suit by the commissioner of labor, to recover taxes or contributions alleged to be due by the defendant as such employing unit, the judge, by consent trying the case without a jury, was authorized to find that the work performed by some of the contractors was a part of the defendants' usual business of manufacturing lumber and lumber products; but his finding to that effect as to contracts for the hauling of rough lumber was contrary to the evidence and without evidence to support it.
(b) If the hauling of rough lumber from contractors' mills to the defendant's manufacturing plant was done solely by contractors, none of such work being done by the defendant directly through its own employees, the work so performed by the contractors would constitute no part of the defendant's usual business, within the meaning of such statute. *Page 711 
2. Section 19(f) of the unemployment compensation act is not invalid for any reason urged, as violating the due-process or equal-protection clauses of the State and Federal constitutions, or the principle of uniformity in matters of taxation, as expressed in the State constitution.
3. The issues being separable, the judgment refusing a new trial is affirmed in part and reversed in part, as stated in the opinion, infra.
 No. 14606. OCTOBER 12, 1943.
Ben T. Huiet, as commissioner of labor and administrator of the unemployment compensation act, sued Jeffreys-McElrath Manufacturing Company, a corporation, to recover $298.74, alleged to be due by the defendant as an excise tax upon the privilege of employing workers. There was no demurrer to the petition, but the defendant answered, denying the alleged liability, and attacking pertinent provisions of the unemployment compensation act as unconstitutional. The judge, trying the case without a jury, found for the plaintiff, and refused a new trial, and the defendant excepted. The motion for new trial was based on the general grounds, with amplifications by amendment.
The issue as presented related to workmen who were not servants of the defendant, but were employees of independent contractors; it being conceded in the petition that the defendant as an employer had paid all taxes, sometimes referred to as "contributions," for which it had become liable on account of laborers employed directly by it. The liability was claimed solely under section 19(f) of the act of 1937 (Ga. L. 1937, pp. 806, 841), which provides in part as follows:
"Whenever any employing unit contracts with or has under it any contractor or subcontractor for any work, which is part of its usual trade, occupation, profession, or business, unless the employing unit as well as each such contractor or subcontractor is an employer by reason of section 19(g) or section 8(c) of this act, the employing unit shall for all the purposes of this act be deemed to employ each individual in the employ of each such contractor or subcontractor for each day during which such individual is engaged in performing such work; except that each such contractor or subcontractor who is an employer by reason of section 19(g) or section 8(c) of this act shall alone be liable for the employer's contributions measured by wages payable to individuals in his employ, *Page 712 
and except that any employing unit who shall become liable for and pay contributions with respect to individuals in the employ of any such contractor or subcontractor who is not an employer by reason of section 19(g) or section 8(c) of this act may recover the same from such contractor or subcontractor. Each individual employed to perform or to assist in performing the work of any agent or employee of an employing unit shall be deemed to be employed by such employing unit for all the purposes of this act, whether such individual was hired or paid directly by such employing unit or by such agent or employee, provided the employing unit had actual or constructive knowledge of such work." Code Ann., 1941, Cumulative Part, § 54-657(f).
In paragraph 5 the petition alleged that the usual business of the defendant is the manufacture and processing of lumber and lumber products, and that in the prosecution of such business, it has performed the following acts, namely: (a) Purchased and now owns in several different counties of this State large bodies of timber lands in fee, and has leased timber rights on other bodies of land within this State. (b) Contracted with other persons to fell certain parts of timber growing on said bodies of land, such timber when so felled to be manufactured and processed by defendant. (c) Contracted with other persons to fell certain parts of timber growing on said bodies of land and to haul said felled timber or logs to sawmills operated by such persons and other third persons under contract with defendant to saw said timber or logs into rough lumber to be delivered to defendant's plant to be further manufactured and processed by defendant directly. (d) Contracted with said persons and others to saw such felled and hauled timber or logs into rough lumber, said lumber to be delivered to and further manufactured and processed by defendant directly. (e) Contracted with other persons to haul such rough lumber from such sawmills to the plant of defendant, there to be further manufactured and processed by defendant directly.
The petition further alleged, that each and all of said operations, from the felling of the growing timber to the delivery of the rough lumber to the plant of the defendant for further manufacture and processing, was and is a necessary part of the usual business of the defendant, and each and every worker engaged in each and every such operation, from July 1, 1937, to date of filing of this suit, *Page 713 
December 7, 1942, was and is a covered employee of defendant under the terms of said law, which said law requires the defendant to report and pay taxes with respect to each and all of said workers, whether said workers are employed directly by the defendant or by any contractor or subcontractor with or under said defendant, provided that no such contractor or subcontractor has under him eight or more such workers engaged in such operations.
J. M. McElrath, vice president and secretary of the defendant corporation, testified as follows: "The corporation [defendant] owns land in more than one county, about five or six different counties around middle Georgia, some twenty-five or thirty thousand acres. The land consists of some timber land and some farm land. We do not do any farming. We are engaged primarily in the lumber business. We are not land dealers. We acquire this land for the timber rights, for the purpose of processing lumber, growing timber. Our plant or headquarters is not in the City of Macon, but is in Bibb County outside of the city, near Macon. We operate a band-mill, which is just a big sawmill and operates on a little different principle from what we call a circular mill or "coffee-pot" mill. We saw timber and have a planing-mill connected with this same plant. We manufacture and sell what we call processed lumber, and we also have a cut-up plant, boxes and crates and things like that. That is our main business, the manufacture and sale of lumber, boxes and crates. In ordinary language, we speak of timber as the standing trees. When the trees are felled, they are called logs. When the logs are hauled to the sawmill and sawed, we call the product lumber, whether it is marketable lumber or not. It may be that some businesses sell what we call green lumber, but we do not sell it. Our final business is the processing of lumber. We manufacture it, cutting it up and processing it, and then sell it. . . We buy timber lands and buy timber leases, purchasing the fee-simple title to some land, and in other cases we lease the right to the timber on the land. Then we have the saw-mills, you call it pecker-woods or round mills, that are independently owned. We do not own any of them. I am now speaking of our practice from the start of our business back in 1919. We pay them a contract price to go there and cut, and sometimes, as in the case of Mr. Ford's son Robert, we pay him contract price to cut the trees and deliver them to Mr. Ford's mill. We pay Mr. Ford *Page 714 
a contract price to cut these logs up into lumber and stack them in the woods. Sometimes it is stacked and sometimes it is not. Then we pay another contractor to deliver that lumber from that woods operation to our plant in Macon; and after we get it to Macon, of course we use our own labor and rehandle it, reprocess it. . . Mr. Ford's son, Robert Ford, had the contract to cut the trees and deliver them to Mr. Ford's mill. We paid him for the cutting, giving him instructions to cut all of the pine and all of the poplar that measured a certain diameter. Mr. Henry Ford has been with us about fifteen or twenty years, and he has been with us so long, he knows our type of business so well, that when you ask me did I ask him this or tell him that, it is all understood. He knows pretty well what I want; he has been with us so long. We contract with Robert Ford to fell that class of timber and deliver it to Henry Ford's sawmill. He then saws it at so much a thousand. Mr. Hatcher has delivered most of that timber to our plant. Mr. Hatcher has a contract to deliver the sawed lumber after Henry Ford has sawed it. Mr. Hatcher hauls it from the sawmill site to our plant here; whereupon we take it and process it in our own way. . . This operation of Mr. Ford is typical of our operations with other sawmillers. Not all of them enter into two separate contracts like Henry Ford and Robert Ford, but a lot of them not only cut the logs but saw them. All of the lumber hauling is under contract. . . All of these contracts are based upon so much per thousand feet for hauling and sawing and all. That is our unit of measurement. . . We work the lumber, cut it up and nail it up, and put it in boxes. Besides selling the lumber in carload lots, we cut it up and manufacture into boxes and crates and such things as that.
"Jeffreys-McElrath Manufacturing Company does not sell any of the lumber in the same form that it comes to our plant from the forest. There is always something done to it, so therefore you would say it is in a different form, even though it may be just trimmed. There is some process it goes through. . . Sawmilling is an independent occupation, an established occupation of itself, I think. I think there are a lot of men in business similar to the one in which we were engaged, who would not be competent sawmillers. I think a lot of them are like me, and I wouldn't be competent at all. As far as I know. I think most of them operate *Page 715 
the same as I do. Practically all of the mills similar to ours operate more or less the same. Some few of them I have heard of that operate some mills of their own, but it is not done very much. Most all of them have the same type of operation that we do; that is, that they usually contract for the sawing and hauling of the lumber, as they have found years ago that a contractor can do it so much better than they can. As to whether I would consider myself competent to go out and give Mr. Ford instructions as to how to operate his sawmill, I don't stick out my neck like that. I don't have anything to do with his employees. I have never helped him get any employees. I have never concerned myself with how much he paid employees, except with reference to wage and hour law. . . If he doesn't pay according to the wage and hour standards, we can't ship the logs in commerce; or at least the Wage and Hour Division had tried to make us think that anyway. Prior to the wage and hour law we never concerned ourselves at all with how much was paid by Mr. Ford to his employees. We do not keep information as to how many employees he has got. We do not keep informed as to what time Mr. Ford and his employees go to work. We do not care how many employees he has got. We do not instruct him as to when he shall begin work on any particular tract, or as to when he shall work. We do not instruct him as to what time to begin work in the morning, or what time to quit in the afternoon.
"With reference to Mr. Hatcher and the others in his situation who haul under contract for Jeffreys-McElrath Manufacturing Company, Jeffreys-McElrath has never owned any trucks in which it hauled its own logs or lumber from the forest to its plant until about the last couple of months. Then we had to, because contractors can't get any trucks. We do not care about it, but we have some trucks doing some logging of our own, because of priorities. . . As to how we operate to get the stock to our sawmill here in Macon, starting back to the timber land, up until about two or three months ago, we had two ways: one, we bought logs from people who brought them to us and sold them. I suppose those logs were cut and felled and hauled by the men who owned them and sold them to us. We did not own the timber at all with reference to that class. We just bought the logs. The other way was, we had independent contractors, I call them independent contractors, *Page 716 
a fellow who contracted to cut our own logs and deliver them to our own plant. Now, about two or three months ago, we had to establish one log camp of our own with our own trucks and our own equipment. They are our own employees, and we acknowledge liability as to them and report them for unemployment contributions. We deny liability with respect to what we call independent contractors."
The only other witness was Henry S. Ford, who testified, consistently with McElrath, as to the manner in which Ford had dealt with the defendant for a number of years, operating his own sawmill with which he sawed logs into lumber for the defendant under contract. He testified also: "I use my labor both to operate my sawmill and for farming purposes. I have got to where I have to shift them backwards and forward, harvesting peanuts; and sometimes the grass gets on me, and I will stop and plow. I do that when I need and as I please. Nobody has ever told me when to and when not to."
The parties presented to the judge, for consideration as evidence, an agreed statement as to certain matters, including the following:
"II. It is understood that the sole question in this case is the liability of the defendant to plaintiff for taxes upon compensation of the class of workers referred to in this suit, and the right of said workers to benefits under the terms of the Georgia unemployment compensation law. Contractors or subcontractors who have in employment under them eight or more workers, and all such workers, are not included in said class of workers.
"III. It is further stipulated that in the event that the court shall finally determine that the defendant is liable for said taxes, the Bureau will furnish an auditor, and he, with the auditor of the defendant, will from the wage records construct supplemental reports in accordance with the law, compute the taxes due, and judgment will be rendered accordingly, the amount named in this suit being fixed solely for compliance with the formalities of the law.
"IV. It is stipulated that the sawing of logs into rough lumber is an established and recognized business, and that felling timber and hauling logs and hauling lumber is engaged in by persons who saw lumber and by some others who do not saw lumber. The Bureau, however, insists that under the special statutory provisions of the Georgia unemployment compensation law such workers are in this case covered employees of defendant. *Page 717 
"V. The haulers with whom the defendant contracts to bring the rough-sawed lumber and logs to its plant from the forest are compensated upon a price per thousand feet, the rate being fixed by agreement and depending upon all factors, such as distance, conditions of the roads, and the like. The haulers in question furnish their own trucks and equipment, and employ their own labor. The contract with the haulers does not require that they shall themselves perform any personal services, but they are free to do so if they like, and they in fact do drive their trucks and perform other labor in connection with hauling, as loading, unloading, etc. Defendant does not pay the employees of the haulers directly, and does not determine or have anything to do with the amount of their compensation, except that it does require the haulers to agree to comply with the fair-labor standards act of 1938. The testimony of J. M. McElrath and [Henry] Ford, relative to the relationship between the defendant and the contracting sawmillers, illustrates the relationship between defendant and the haulers with respect to control and right of control over the haulers and their employees.
"VI. It is further stipulated that if: (a) Increased volume of business required additional output of the plant, defendant could either require of Mr. Ford a minimum quantity of rough lumber or contract with others to produce such minimum. (b) If Jeffreys-McElrath's orders for finished products required a different type of raw material, Jeffreys-McElrath could direct Mr. Ford to change his specifications and saw the timber into rough material accordingly, Mr. Ford agreeing thereto. (c) On the other hand, if business becomes slack, defendant can either reduce the output by Mr. Ford or terminate the contract entirely.
"VII. At all times, until delivered at the plant, the felled timber and sawed lumber remains the property of defendant. If sawed lumber be burned at the sawmill, the loss would be defendant's, and not Mr. Ford's.
"VIII. That the charter of defendant contains the following provision, namely: `The object of the proposed corporation is pecuniary profit and gain to its stockholders. Petitioners propose to carry on the business of manufacturing lumber and boxes, buying, selling, and leasing timber and timber lands, and engaging in any and all kinds of lumber and timber business.'
"IX. Defendant has at times bought, sold, and leased timber *Page 718 
and timber lands; but its principal business is the manufacture and processing of lumber, boxes, and other products from lumber."
1. According to the evidence, the defendant is both an "employer" and an "employing unit" within the meaning of the unemployment compensation act. Ga. L. 1937, 806, 841-2, § 19(f)-(g). It is engaged in the business of processing and selling lumber, and articles manufactured from lumber. It acquires standing timber by purchasing either the land on which it stands or the timber itself under timber leases. It owns and operates a large sawmill at its plant near Macon, but it also contracts with operators of smaller mills to convert standing trees owned by it into lumber, and with still others to haul the lumber from these mills to its plant. In some cases it contracts with loggers to fell the standing trees, cut them into logs, and haul the logs to the sawmills. These contractors are not themselves "employers" within the meaning of the act, not having the required number of employees, and not being otherwise subject to its provisions. They do employ laborers, however; and the judge found that while they are independent contractors, employing directly their own workmen, the individuals so employed by them are to be deemed employees of the defendant, under the provisions of this statute. See section 19(f), as quoted in part, supra. The defendant contends that this section is ambiguous and cannot be properly construed as applying to such a state of facts. It invokes the rule of strict construction that is ordinarily applied to tax statutes, and points to various words in this provision, especially the term work, which it insists, if properly construed, would require a different result.
The unemployment compensation act is quite lengthy, and it may be that some of its provisions should be construed strictly as a taxing statute, and that others should be interpreted according to some more liberal rule. For example, the provisions which determine the amount of the exaction, by prescribing the rate of contribution and defining wages or remuneration upon which it should be computed, might be subject to one rule of construction, while those relating to other matters would be subject to a different rule. Thus section 19(f) should perhaps be construed in part as a taxing *Page 719 
statute, since it may under some conditions either create or increase a tax liability as against some one; but even so, the paramount rule in all cases is to ascertain the intention of the legislature, looking to the statute as a whole, and keeping in view at all times the old law, the evil, and the remedy. Under this rule, we are of the opinion that section 19(f) covers the present case as to most of its features. Stripped of such terms and conditions as are not here in question, this section provides, in effect, that when an employing unit contracts with another for work that is a part of its usual business, the employees of the contractor while engaged in such work are to be deemed employees of the employing unit for all purposes of the act. If the employing unit shall become liable for and pay contributions on account of such employees, it may recover the same from such contractor. If the contractor is himself an employer within the meaning of the act, he alone is liable for the contributions on account of his employees. While there may have been other purposes inducing the enactment of this section, it seems to us that at least one purpose was to prevent owners of large unitary businesses from breaking them up into small operations, and thereby defeating the objects intended by the General Assembly.
It is argued that section 19(f) relates only to "work," whereas in this case the contractors employed machinery and money, as well as labor, in performing their contracts. This argument, we think, unduly restricts the word. Its meaning here cannot be limited to the mere exertion of physical or mental effort, but must be taken to include the accomplishment of any result necessarily or usually required as a part of the business of the employing unit as it is actually conducted, even though equipment and labor both be employed. The exaction is made, of course, only as to labor, the wages paid being the basis of the required contributions.
Whether in any case the work let to the contractor is a part of the usual business of the employing unit is ordinarily a question of fact. The business of this defendant is that of producing and selling lumber and articles made from lumber. Although formerly it bought some of the logs that were used at its mill, it had ceased this practice before the present suit was filed; and it does not now buy any logs, whether delivered in the woods or at its plant, nor does it buy rough lumber. It conducts its business by purchasing standing timber which is put through the usual processes *Page 720 
of manufacture from which finished products result. Some of these operations are performed for it by others as contractors; and as to all of them except one, namely, the hauling of rough lumber, the evidence authorized the inference that they constituted parts of the defendant's usual business. There was no evidence that the defendant at any time was engaged in the hauling of rough lumber from the small mills to its plant by individuals directly employed by it, but it appeared without dispute that all such transportation was accomplished by it solely through independent contractors, and thus that such hauling or transportation was not a part of its usual business. We shall refer to the exception as to hauling rough lumber later on in this opinion, and in the meantime it will be implied; but before dealing with it further, some additional observations should be made as to the general aspects of the case and applicability of the statute.
In ruling that the finding of the judge was authorized as to some of the operations, we do not overlook the provisions of the act defining employment as services performed by an individual for wages, and declaring that such services shall be deemed employment subject to the act, unless it is shown, among other things, that such individual is customarily engaged in an independently established trade, occupation, profession, or business. § 19(h) (6) (C). These provisions are to be construed in harmony with those in subparagraph (f), declaring in express terms that, under the conditions there stated, "the employing unit shall for all the purposes of this act be deemed to employ each individual in the employ of each such contractor or subcontractor." Accordingly, the fact that no wages are paid by the defendant directly to such employees will not render section 19(f) inapplicable; the wages paid by the contractor being reasonably ascertainable, and constituting the basis for determining the contributions required of such employing unit.
Nor will the fact that the contractor may be customarily engaged in an independently established business have the effect of relieving the employing unit, where it contracts for work that is actually a part of its usual trade or business. As to this phase, the present case might perhaps be different if the defendant did not itself operate a sawmill, to which the other mills and related operations, as the judge was authorized to find, were merely auxiliary. In connection with this mill, the defendant, with the one exception as *Page 721 
to hauling rough lumber, performed directly, with its own employees, substantially all of the kinds of acts that it contracted with other persons to perform in connection with such other sawmills; and in these circumstances the work of the same kind performed by such contractors necessarily constituted a part of its usual business. Moreover, while it was shown that the sawing of logs into rough lumber is an established and recognized business, and an "independent occupation," neither the testimony nor the stipulation as to this matter went beyond mere classification in the abstract, and there was no evidence whatever that any of these particular contractors were customarily engaged in an independently established business. For aught that appears, they served this defendant only, and did not at any time perform or offer to perform similar services for any other person.
On the facts appearing, the finding for the plaintiff was fully authorized as to all matters in issue, except as to the hauling of rough lumber; but as to this particular feature it was contrary to the evidence and without evidence to support it, and should have been set aside on motion for a new trial.
2. The defendant attacked section 19(f) as unconstitutional, for several reasons. It was alleged to violate the due-process and equal-protection clauses as contained in both the State and the Federal constitutions, as well as the requirement as to uniformity in matters of taxation, as expressed in the State constitution. One contention is that the section is so vague and indefinite as not to be enforceable consistently with due process, in that it provides no basis for imposing the tax or contribution other than the unbridled discretion of the administrator. But, as we have already indicated in this opinion, the meaning of the section is sufficiently clear as applied to the facts presented, and we entertain the same view even when it is considered from the standpoint of due process. Certain facts must exist before the tax can be required; but that is true of every tax law, since statutes do not levy taxes without reference to facts.
Again, it is said that the statute is lacking in due process, because its enforcement could result in compelling the contractor, upon whom the burden ultimately falls, to contribute twice upon the wages of each employee, if perchance he should devote a portion of a day to the performance of one contract, and the remainder to *Page 722 
the performance of another. There is no merit in this contention. The statute does not fix wages, but measures the contributions of the employer by the wages paid, and the wages paid may readily be apportioned according to the time each employing unit is served. It necessarily follows that the liability of the contractor could not be increased by a division of hours between different employing units, unless by his own failure to keep proper accounts. While the employing unit has no control over the wages paid by the contractor, yet it is not the party ultimately liable for the tax or contribution, and is hardly more than a collecting agency for the State.
Nor can we assume that information as to the amount of the wages will not readily be given by the contractor on request; but if there should be any danger or apprehension on this point, the employing unit may easily protect itself from the beginning by exacting promise of such information as a matter of contract.
So, the fact that the employing unit has no control over the amount of the wages and may have no first-hand knowledge of the amount does not render the statute invalid as violating the principle of due process, as to such party.
It is contended further, that section 19(f), in placing ultimate liability upon a contractor performing such work for an employing unit, notwithstanding he may have less than eight employees, arbitrarily discriminates against him and in favor of others having the same number of employees, but who do not enter into like contracts, and simply by not doing so remain free from such liability. In view of at least one conceivable purpose of this section as mentioned previously herein, we think it is based on reasonable classification. Accordingly, it cannot be held unconstitutional as being discriminatory. For similar reason, it does not appear to violate the constitutional requirement as to uniformity in matters of taxation.
Many decisions were cited on both sides; but we shall mention here only those that seem to be most directly in point, none, however, being exact precedents. (1) As to constitutionality: Singer Sewing Machine Co. v. N. J. Commission, 128 N.J.L. 611
(27 A.2d 889); Friedman v. American Surety Co., 137 Tex. 149
(151 S.W.2d 570). (2) As to "independently established business:" Fuller Brush Co. v. Industrial Commission,99 Utah, 97 (104 P.2d 201, 129 A.L.R. 511); Singer Sewing Machine Co. *Page 723 v. Unemployment Compensation Commission, 167 Or. 142
(116 P.2d 744, 138 A.L.R. 1398); 21 Words Phrases, 54. (3) As to construction generally: Strickland v. Natalbany Lumber Co. (La.App.), 200 So. 652; Raines v. N. J. Commission, 129 N.J.L. 28
(28 A.2d 46); Unemployment Compensation Commission v.
Mathews, 56 Wyo. 479 (111 P.2d 111); McGrath v. Pa. Sugar Co., 282 Pa. 265 (127 A. 780, 131 A. 926); Pruitt v.
Harker, 328 Mo. 1200 (43 S.W.2d 769); Simpson v. New Madrid Stave Co., 227 Mo. App. 331 (52 S.W.2d 615); Purkable v.
Greenland Oil Co., 122 Kan. 720 (253 P. 219); Betz v.
Industrial Commission, 109 Colo. 385 (125 P.2d 958).
3. We have held in the first division that the judge's finding for the plaintiff was authorized as to all matters in issue, except as to contracts for hauling lumber, and was not authorized as to these contracts. The parties stipulated in effect that in the event the court should determine that the defendant "is liable for said taxes," they would co-operate in constructing supplemental reports and computing the amount of the taxes, for which judgment should be rendered. It appears that the facts were fully developed upon the trial now under review, and that the issues are separable. In the circumstances the judgment overruling the motion for a new trial is affirmed except as to the one issue, namely, whether the hauling of rough lumber was a part of the defendant's usual business; that is, whether this class of work was done solely by contractors, or whether a part of such work was usually done by the defendant directly, so as to be a part of its usual business, as alleged in paragraph 5(e) of the petition. As to this issue only, the judgment refusing a new trial is reversed and a new trial ordered.
Judgment affirmed in part and reversed in part. All theJustices concur.