The judge of the civil court of Fulton County did not err in finding that certain truck drivers of the plaintiffs in error, defendants in the court below, were employees for wages, and that unemployment contributions were due thereon.
 DECIDED JUNE 10, 1943. REHEARING DENIED JUNE 30, 1943.
Ben T. Huiet, as commissioner of the Department of Labor of Georgia, sued the "Crown Laundry," a partnership composed of William R. Brewster and D.C. Woodward, to recover unemployment contributions alleged to have been due and unpaid on a number of alleged employees who had not been reported as employees by the defendant. A judge of the civil court of Fulton County found for the commissioner on the facts, without a jury, and the defendant excepted.
A. M. McLendon testified for the plaintiff: ". . I am employed with the defendants as manager of Crown Laundry. . . I have supervision of the entire operation. That includes the hiring of the personnel and the direction of the personnel, and the demotion or firing of the personnel. What you term route men or *Page 594 
persons who solicit laundry for processing and bring to the place, I don't have charge of, haven't any now that I have charge of. Such contracts as those men have with the partnership is had with me for the partnership. These men that bring laundry to the place are [naming them]. . . I do not have any written contract with these men with respect to their duties and obligations to the company. I made a verbal contract with them. I had the same agreement with all of them, which was, whatever business that they might bring, they was to pay me sixty per cent. of the gross amount on the laundry, fifty percent. on dry cleaning, on whatever amount they may bring in. I wasn't interested in where they got it. I had a fixed price and price list of what was charged for services and they solicited laundry for processing in the field. There was not a fixed route or territory for each of these men, not so to speak. Of course, they can work in a certain territory but it is not required. A man working that way can go where he wants to. They do go other places than in their own territory. Mr. Davis lives at Red Oak. He gets laundry at Red Oak, and he gets some in East Point and some in Hapeville. He has regular customers, I suppose. I know enough about the laundry business to know that a truck man has regular customers who he serves and he builds those up, to build up a route. That is the way these boys work it. My concern, me, or anybody for me did not give them any instructions with reference to the ultimate territory. Whether they had any understanding about encroachments on the other's territory, I don't know. I never have questioned them. They do, so far as I know, encroach upon one another's territory, as I told you, but Mr. Davis, he gets laundry pretty near all over the county. After Mr. Davis has established the patronage of any certain family, he serves that family himself. Whether or not patrons are interchanged as among these truck drivers at all, I couldn't say. I don't know. I rather think sometimes they did. Whether they compete with one another for customers, I couldn't say, because I am not out with them. . . To start with I did not have any different arrangement with these men. This arrangement has been the only arrangement I had with the truck men, all that worked out there, not for the laundry. I have one truck driver now, not picking up laundry. . . He is hired by the laundry. He don't go out generally, not to solicit laundry. The persons employed other *Page 595 
than these truck drivers, I think are about twenty-six. I have an average of more than seven for all of the weeks of the year. We are paying unemployment contributions on all except these truck drivers, and the only persons whose names are not recorded together with the wages are these truck drivers. The business of this defendant is to launder clothes. The business of these men is to bring clothes and stuff to the laundry. . . They can take it to any laundry they want to and when they do bring this work to the laundry that enables the laundry to get a larger volume of business. It is one of the ways in which the defendant gets business to do, and the arrangement I made with them does enable the defendant to engage a larger volume of business. These men do not list all of their laundry which they pick up on laundry tickets on which the name of the article and the price is printed. They have only one ticket that the price is printed on. They do have one. I furnish them with that ticket and it has the trade name printed on it, but all of the tickets have those independent men — work done for Nick Weathers by Crown Laundry, or work done for Marcus Drake by Crown Laundry. When we started that practice, I can't recall. It has been some time ago. It might have been about the time the question came up about unemployment compensation last year. Whether that particular ticket was printed in view of the controversy as to whether we would or would not return them for contribution papers, it was not for that particular purpose — others. Various things; wrecks, claims, just different things that we would have, and this was one of them. Adjustments on lost small articles that have been collected by these various men, they make them themselves. I have them make them, and let them make them for themselves. Of course, I don't know the customers of the truck men. The customers hold them responsible and they make their own adjustments. I make the adjustment in my office for what you bring me individually, any complaint of our own business. I do not have any forms on which these claims are made. How I handle a claim is if they make any claim that there is something lost or damaged I tell them, well, just settle it up with the customer, which they do, and they lose their commission on that, and I lose the value of the article. They make the adjustment and I honor the adjustment which they make. These men at one time carried the Crown Laundry sign on their *Page 596 
trucks. I changed that at the same time we changed the tickets, and that was part of the preparation to avoid responsibility of a number of things, including this unemployment compensation. These men do not do anything else except solicit this work for Crown Laundry. A part of their work is not in the Crown Laundry's place of business. They bring it there when they pick it up on the route. That just takes a few minutes. They do not have to check it in. They don't check it in or out, they come there to get it. They don't come there to keep their records. They have nothing to do with the records we keep. We keep the records. They bring the laundry there and just dump it without checking the laundry slips. They have nothing to do with that. They do have a laundry slip with each bundle. They make it up for the customers, but they never check that with any of our people. They bring the bundle and put it in a certain place where we tell them to put it and they have nothing to do with the handling of it until it is put back on the shelf again for them. Some part of their work, which includes the delivery of the work to us and putting the finished work on the shelf, the finished work from us for delivery, that takes place in our plant."
On cross examination, the witness testified: "They don't do any work in our plant for our company. The only thing they do is to bring in their laundry and set it down. That is all they do, and they have got a laundry ticket on it, on the outside. They don't even put on what is included; just the name and address. The items are not listed. We do that in our plant. When they get in, they do not do any work except pick up the bundle, that's all. They do no work, wash no laundry, keep no books there in the plant. We have no contract whatever with the customers of these drivers. We do general laundry work for the public and have a standard charge for the general public for certain work. The work that we do for these men we charge the same amount for it, for that particular work, but these men pay us either fifty or sixty per cent of our standard price, on account of the volume they bring in. They, themselves, are responsible for any bills of these particular customers. They pay me for the work Saturday nights. We have a truck driver named Davis. If Davis brings in forty bundles to be washed; do I carry on my books the names of any of those forty or do I carry that on Davis' — against Davis, the amount against *Page 597 
Davis, I carry it on Davis' account book. Every book is headed up. Of course, I put the name of the bundle. I have to keep it straight. I put the name of the bundle. It is under the head of `Davis.' I charge it to Davis on the book. Each one has an individual book. I have the customer's name there in order to account count with Davis. I collect from Davis. I do not have any account count with any single customer of Davis. I bill that to Davis, the amount of it. I have those amounts to check with Davis, how much he brought in. In the event that Davis don't collect from John Smith, for instance, I collect from Davis. I do not give any customer of Davis credit. If Davis doesn't collect from half his customers, Davis still pays us. We charge these truck drivers a certain amount of whatever laundry they bring in, the standard price for those truck drivers. There is no agreement between us and any of these truck drivers that they will bring us any specified amount of laundry at any time. . . We have no agreement with these truck drivers that they will continue to bring our laundry, all of the laundry of their customers for any period of time. . . None of the customers of Davis as a general [name] come to the laundry to get laundry and pay for it there. No sir, I would say maybe some. A man might drop by if there would be a bundle that he failed to deliver but the money is turned right over to Davis and not even entered on our book at all. That money does not go into the account of the Crown Laundry. It is put in an envelope and I hand it to Mr. Davis. I have got the customer's name on my book. I do not mark his name or account satisfied and paid if he does that, if he comes and gets that particular bundle. I leave that with Mr. Davis for the customer's account. . . In regard to the man who comes in and gets his laundry and pays for it, what about that particular item on my books when I take his money which I turn over to Davis, I don't do anything. I keep the record straight. It is charged to Mr. Davis and Mr. Davis pays me on Saturday night. We keep a list of the bundles that Davis brings in, and I put the amount down of wash done of the bundle. Those items go on the books of the company as payable to the company by the truck driver. I do not charge anything to any customer of any of these truck drivers. I charge it to the truck driver. I put the name and the amount down but it is charged to Mr. Davis. I keep the names of, say, Davis' customers and the amount of *Page 598 
wash to keep up with it through the plant. I do that to check up for the truck drivers. If Davis brings in 100 bundles to be washed, it makes no difference in accounting, to our company, whether we list the bundles as 1, 2, 3, 4, 5, on to 100, or list the names of the individuals. . . It makes no difference as to the name of the customer. . . Some of the bundles don't have any name, just a street number. We do not have any account, charge and collect, with the individuals who gave the laundry to these truck drivers. . . I don't look to them for it and don't get it. We never file suits against any of these customers brought in by the truck driver. We never filed a suit. In our contract with the truck driver, we do not agree that we will be responsible for any damages that they may cause, particularly liability, things like that. We do not carry any insurance to protect our company against acts of these men that drive these trucks. They own the trucks. Crown Laundry has no interest in the trucks. They are owned exclusively by the men that drive them. Our company does not pay any part of the operating expenses of those trucks, or have anything to do with it at all. If you were a customer of Davis and the laundry should wash some shirts and tore them, Davis settles that himself. Our company would have an account with Davis with reference to that. We do not adjust losses with the truck drivers for damage done to stuff they bring in the same as we adjust it with other individual customers of the laundry, I mean general customers. . . As to whether we have changed the method of operation, the basis with these truck drivers in the last year and a half, the agreement is the same as it has been since I have had charge of the plant. We have not changed the method of doing business with them by reason of any compensation claim or anything of that kind that I know of. I did come up and consult with you about the name on the truck and that was the time we took it off. We do have one truck owned by the Crown Laundry. The name was down in the corner. It was good-sized letters, regular truck sign. We don't have that at all. We discontinued that. We have not changed our method or agreement with these fellows, these truck drivers since that time. We do not carry these truck drivers on any payroll of our company. We have never carried them on our payroll. We do not pay them any specific salary. They pay me." *Page 599 
On redirect examination, witness testified: "I do not remember a conference I had with one of your agents on June 13, 12 or 13, 1941. I can remember having a conference with you but I don't remember the words. After that conference I did not go to see Colonel Westmoreland. I don't think so. If it was before then, I don't remember. . . I don't remember that that was when I got the names of the Crown Laundry off of the trucks. As to whether we put Nick Carter and these other men on our laundry tickets, why, I had that done but I don't know. It has been since I had the conference with him. Yes, that is away back. It was not immediately after. Some time afterwards. As to whether that is the way I testified when you had me on examination before, that that was one of the reasons I did that, to avoid this tax. Why I didn't say so, particularly to avoid this tax. It was just several items all included. I couldn't say that I had that particular thing in mind. . . As to whether these truck drivers solicit exclusively for our laundry, I don't know. Q. (By the Court.) A. As to whether I mean that in contracting with these parties I say nothing about that and give them permission to go to every laundry that they want to, to get business for them. Well, I have no agreement with them, never have. Mr. Davis, when he first came to me give me his laundry and give another gentleman his dry cleaning. I have no agreement with them to that effect. As to what I would do if the territory they developed suddenly went to some other laundry, I couldn't do anything. I would try to develop the territory further by some means. I had that happen week before last when a man sold his route to another man and when he did he solicited the business and took it over to another laundry. I have been in the laundry business in Atlanta and East Point . . six years."
Nick Weathers testified for the defendant, in substance: that he is engaged in the business of collecting laundry from customers in the vicinity of College Park for the purpose of being washed; that he owns his own truck and collects laundry from his customers, and most of the time carries it to the Crown Laundry to be washed; that this laundry which he leaves with the Crown Laundry is left in his own name, and the washing is done for him by the Crown Laundry, and he pays the Crown Laundry for doing the washing: that he has no restricted route nor customers, and is not *Page 600 
obligated to take the laundry to the Crown Laundry; that it is done in his own discretion and at his own choice; that he can take this laundry to either the Crown Laundry or to any other laundry; that he has an agreement with the Crown Laundry that for whatever washing he brings to the Crown Laundry he will pay the Crown Laundry a stipulated charge for each article which is washed by the Crown Laundry; that he delivers the laundry which is washed by the Crown Laundry in bundles, and after the laundry has been completed he receives the bundles and delivers them to his customers, from whom he has obtained the laundry; that the Crown Laundry does not charge any of this laundry to any of his customers, but he himself pays the Crown Laundry for the total laundry done for him; that the Crown Laundry does not make any collections of any sums due to him from his customers, and Crown Laundry does not pay him anything whatever, but he pays the Crown Laundry for the laundry washed for him; that he owns his own list of customers, and he is trying to sell his list to some other person, and this other person, if he sells the list to him, would not be obligated to continue to collect from these customers, and if he collected from the customers he would not be required under the terms of his sale to take the laundry to the Crown Laundry, or any other laundry; that he at no time does any work in the place of business of the Crown Laundry, but merely delivers the bundles of laundry to the Crown Laundry, and receives them after they have been completed; that he has a right to take the laundry which he collects from customers, one week to the Crown Laundry, another week to another laundry, and there is no contract that he will bring the laundry to the Crown Laundry, and when he takes it there it is his choice, and the amount charged him by the laundry is not dependent on the amount so brought, nor upon the regularity with which it is brought; that he has one ticket on which the price to him, of laundry work, is printed by the Crown Laundry, which furnished that ticket to him for his own use; that he has other tickets which have printed on them, "Work done for Nick Weathers by Crown Laundry;" that it is only occasionally that he takes any laundry to any other laundry.
Mr. Ledbetter testified for the defendant, substantially; that he owns and operates a dry cleaning establishment of his own in College Park; in making collections of dry cleaning some of his customers *Page 601 
ask him to take their laundry also and have it washed for them; that he does not run a laundry, and what laundry he collects he sends to the Crown Laundry; that these customers are his regular dry cleaning customers, and he takes the laundry as an accommodation to them; that his arrangement with the Crown Laundry is that he is to pay the laundry for the clothes washed for him at a stipulated price; that the Crown Laundry does not pay him any money whatever and makes no collections for him, but that he collects from his own customers and delivers the laundry back to the customers and collects from the customers for the work that has been done; that he is not obligated in any way to carry or send any amount of laundry to the Crown Laundry, but is free to carry or send the laundry to any laundry he might choose.
The only question for determination is whether under the evidence the court was authorized to find that certain truck drivers were employees of the defendants for wages, and that the defendants owed the plaintiff the contributions due under the law by reason of such fact. The defendants contend that the evidence demands the finding that the truck drivers were not employees for wages. There are several reasons why this contention is not well founded. It is of course possible, permissible and legal for the defendants to have made such an agreement with the truck drivers as would have relieved the defendants from the payment of the tax, even if the purpose of the agreement was to escape the tax. The evidence does not demand the finding, however, that this was done. The evidence authorized the finding that the original arrangement was that the truck drivers were employees of the defendants, employed to collect and deliver laundry on a commission basis, and under which the defendants were responsible to customers for loss of or damage to laundry. It also authorized the finding that originally the laundry's name was on the trucks used by the drivers, and the laundry tickets showed the defendants to be one party to the contract for washing the laundry, and the owners of the laundry to be washed, the other party; that the arrangement was changed for the purpose of avoiding the payment of the unemployment compensation tax on the drivers, as well as for other reasons. It shows *Page 602 
that the defendants controlled the trucks to the extent that the defendants required the drivers to put the driver's name on each truck, or did so themselves, and that the defendants printed the new tickets showing that the laundry was done for the drivers and not for the owners of the laundry. These evidences of control might not in themselves be significant or determinative of the relations between the parties. It may be that if the facts are as contended by the defendants the drivers would be independent contractors operating under such an agreement as would relieve the payment of the tax. We think that under the evidence produced, the finding was authorized that the drivers were mere employees paid on a commission basis. The names of the customers of the defendants or the drivers were available to the defendants, and its failure to produce any evidence at all from any of them to the effect that they contracted solely and exclusively with the drivers as principals was a circumstance to be considered with the other facts, the sum total of which authorized the finding arrived at. See Cotton States FertilizerCo. v. Childs, 179 Ga. 23 (174 S.E. 708). The finding was authorized that the commission carried the burden of proving that the drivers were employees for wages; that they had not been free from direction and control in the performance of their services; that the services were not outside the usual course of the business of the defendants; that all the services were not performed outside of all the places of business of the defendants; and that the drivers were not customarily engaged in an independently established trade, occupation, or business. SeeRoyal Cigar Co. v. Huiet, 195 Ga. 852 (25 S.E.2d 810) as to the validity of the provision of the unemployment act found in sec. 19 (h) (6) (A), (B), and (C), Ga. L. 1937, pp. 806 et seq. The court did not err in finding against the defendants.
Judgment affirmed. Stephens, P. J., and Sutton, J., concur.