30623. UNION DRY GOODS COMPANY *v.* COOK, revenue commissioner.

DECIDED NOVEMBER 3, 1944.

710

712

714

716

*Wallace Miller, Wallace Miller Jr.,* for plaintiff in error.
*Clifford Walker, A. L. Henson,* contra.

GARDNER, J. ■ The trial court found in favor of the plaintiff, reasoning (correctly, we think,) that the facts of the case

placed liability on the defendant under the provisions of the unemployment compensation act as set forth in Ga. L. 1937, pp. 806, 840, sec. 19 (f) ; Ga. Code Ann., § 54-657 (f), which reads in part as follows: "Whenever any employing unit contracts with or has under it any contractor or subcontractor for any work, which is part of its usual trade, occupation, profession, or business, unless the employing unit as well as each such contractor or subcontractor is an employer by reason of subsection (g)· of this section or section 54-823, paragraph (c), the employing unit shall for all the purposes of this chapter be deemed to employ each individual in the employ of each such contractor or subcontractor for each day during which such individual is engaged in performing such work; except that each such contractor or subcontractor who is an employer by reason of subsection (g) of this section or section 54-623, paragraph (c), shall alone be liable for the employer's contributions measured by wages payable to individuals in his employ, and except that any employing unit who shall become liable for and pay contributions with respect to individuals in the employ of any such contractor or subcontractor who is not an employer by reason of subsection (g) of this section or section 54-623, paragraph (c), may recover the same from such contractor or subcontractor. Each individual employed to perform or to assist in performing the work of any agent or employee of an employing unit shall be deemed to be employed by such employing unit for all the purposes of this chapter, whether such individual was hired or paid directly by such employing unit or by such agent or employee, provided the employing unit had actual or constructive knowledge of such work."

In the passage of this act the legislature saw fit to express in unmistakable terms the public policy of the State with reference to this legislation. We think it well for our appellate courts, in passing upon the cases arising under this law, to keep the expressions of the legislature uppermost in mind in order that they may better understand the intent of the legislature in applying the provisions of the act to the facts of each case as they are presented. For this reason we quote section 2 of the act (Ga. L. 1937, p. 807; Ga. Code Ann., § 54-602) : "As a guide to the interpretation and application of this chapter, the public policy of this State is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of

this State. Involuntary unemployment is therefore a subject of general interest and concern, which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker or his family. The achievement of social security requires protection against the greatest hazard of our economic life. This can be provided by encouraging employers to provide more stable employment and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing power and limiting the serious social consequences of poor relief assistance. The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this State require the enactment of this measure, under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own."

The trial judge in passing on the motion for a new trial reduced his judgment to writing. So well did he cover the salient facts and so cogent is his reasoning in applying the law to the facts that we feel justified in copying it here in the main, and adopting it as a part of this opinion. Here it is: "Counsel for the plaintiff earnestly insists that section 19 (h) (6) of the act is applicable in this case, and that employees of Stephenson and Mason receive 'wages' as defined in section 19 (n) of the act. The question, so far as this section of the act is concerned, may also be stated: 'Were services performed by the employees of Stephenson and Mason for the [Union Dry Goods Company] for wages?' This court is bound by the decision of the Court of Appeals in the case of *Huiet* v. *Great Atlantic & Pacific Tea Co.,* 66 *Ga. App.* 602 (18 S. E. 2d, 693) which case dealt with the very section now under consideration. As was stated in the *A. & P.* case, it may likewise be stated in this case: 'There is no evidence of subterfuge, no circumvention, no scheme not to comply with the law.' The parties to the present case find themselves honestly disagreeing as to whether or not the act covers the work of certain employees performed in the Union Dry Goods Company Building. It is well established that the consideration for a lease may either be a fixed rental, as was true in the *A. & P.* case, or it may take the form of a percentage of the gross business done, as in the case at bar. In-

deed, the modern method of preparing lease contracts is to provide for a rental based upon the gross volume, or upon the success of the business, with some fixed guaranteed minimum rent. Therefore, it must be said in this case, as was true in the *A. & P.* case, that services were not performed for *wages* for the [Union Dry Goods Company]. The lessees merely paid rent to the lessor and wages to their employees. Having come to the conclusion that services were not performed for wages, in the employment of the [company], then subsections A, B, and C become immaterial, although it is my opinion, and I believe it would be conceded by counsel for the defendant, that the [company] has been unable to prove either of the subsections. I have given due consideration to the case of *Young* v. *Bureau of Unemployment Compensation,* 63 *Ga. App.* 130 (10 S. E. 2d, 412), and *Brewster* v. *Huiet,* 69 *Ga. App.* 593 (26 S. E. 2d; 198), but nothing in these cases changes my view of the applicability of the *A. & P.* case.

"Counsel for the plaintiff also insists on the proposition that regardless of whether section 19 (h) (6) is applicable in this case, that section 19 (f) (2) of the act applies, and that in either event, for the purpose of the unemployment compensation act [Union Dry Goods Company] is deemed to employ each of the individuals in both of the leased departments. When one bears in mind the common-law meaning of the relationship of master and servant, it is most difficult to construe the relationship of employees of Stephenson and Mason to the Union Dry Goods Company as being one of employment; but in construing the Georgia unemployment compensation act, the court must bear in mind the beneficial purpose for which the act was enacted, and also is bound by the statutory definition of the various words in the act. 'In determining the meaning of the word "employment" as used in the unemployment compensation act, the Supreme Court of Appeals was bound by the statutory definition of that word in the act, rather than by the common-law meaning of the master and servant relation.' *Life &. Casualty Ins. Co.* v. *Unemployment Commissioner,* 178 Va. 46 (16 S. E. 2d, 357). 'The courts, as well as the administrator of the unemployment law, in construing and applying the provisions of such law must liberally construe and apply such law in the light of the public policy of this State, as declared in section 2 of the act. The courts shall be guided by the fact that the

unemployment compensation law is intended to provide some income for persons who are, without fault of their own, temporarily out of employment.' *Young* v. *Bureau of Unemployment Compensation,* supra.

"In reviewing the evidence in this case, I am forced to the conclusion that [Union Dry Goods Company] is not in the business of leasing departments, but it is in the business of operating a modern and up-to-date department store. The shoe department is but another one of its units comprising the whole. It is admitted by the defendant that the only reason the shoe department is not operated directly is because experience proves that the method of operating by lease is more profitable to the [company]. . . In applying the factual findings in this case to section 19 (f) (2) of the act, it is necessary at all times to bear in mind the decision . . in the case of *Jeffreys-McElrath Manufacturing Co.* v. *Huiet,* 196 *Ga.* 710 (27 S. E. 2d, 385), for that is the only case in Georgia dealing with this section of the act. The case of the *A. & P. Tea Company,* supra, is not in point so far as this section of the act is concerned, because the court in that case, in declaring that the prerequisite finding of 'employment' could not be established, dealt only with section 19 (h) (6), as employment is defined in that section, and did not have before it section 19 (f) (2) of the act; thus failing to invoke the definition of employment as contained in that section.

"As was stated . . in the *Jeffreys-McElrath* case, at page 719, 'While there may have been other purposes inducing the enactment of this section (referring to section 19 (f) (2)), it seems to us that at least one purpose was to prevent owners of large unitary businesses from breaking them up into small operations, and thereby defeating the objects intended by the General Assembly.'

"While it is true that no fraud or subterfuge has been practiced in this case, and the parties are absolutely honest, the effect of exempting these employees from the provisions of the act would serve the same purpose; that is, to permit one with the best of intentions to discontinue operating his large unitary business directly, and to operate it by contracting with various managers through leases, would have the same undesirable effect, regardless of the bona fide nature of the transaction. The very purpose of section 19 (f) (2) is to protect all of the employees of a unitary

business, whether or not each department has fewer than eight employees, provided the business is an employing unit.

"It is immaterial whether the parties come within the relation of master and servant or independent contractors. The act itself fixes the status of their employment which brings them within the terms of the act, and renders the employer liable for the contributions required by the act. As stated by the Supreme Court of Washington in McDermott v. State, 196 Wash. 261 (82 Pac. 2d, 568), in construing an act similar to the Georgia act, 'It is unnecessary to determine whether the common-law relation of master and servant exists between respondent and the barbers and other operatives in his shop, because the parties are brought within the purview of the unemployment compensation act by a definition more inclusive than that of master and servant.' *Young* v. *Bureau of Unemployment Compensation,* supra.

"Employment, as defined in section 19 (f) (2), has a much broader meaning than it has under the common law. The *business,* the *work,* of [Union Dry Goods Company] is to operate a department store, and a necessary part of its usual business is the selling of shoes and the operation of a beauty shop. It matters not whether the managers of its departments receive a salary from the [company] or a percentage of the profits. If the act could be made ineffective by leasing departments and thus destroy the effect of the beneficial provisions therein provided, section 19 (f) (2) would indeed be meaningless, for it was enacted primarily for the purpose of preventing any such method of evasion. By this I do not mean to say that any of the parties in this case have ever had any intention of evading the act, because I am sure their position is based upon an honest interpretation of the statute.

"I am further forced to the conclusion that [Union Dry Goods Company] is (a) an employing unit; (b) it has under it a *contract* with Stephenson and Mason, which contract is much broader and contains many more indicia of the right of control and supervision than what is known as a simple lease contract (c) for work of providing shoes and beauty-parlor services for the [company's] *customers,* (d) which is part of its *usual business* of operating a modern and large *department store.* (a), (b), (c), and (d) being true, then under section 19 (f) (2) the [company] is deemed to employ each of the individuals in both departments. . . It

actually operated the same bookkeeping department for Stephenson and Mason as for the departments operated directly. That is, part of the shoe-department business and beauty-shop business was done directly by the [company's] covered employees. Not only may bookkeeping be mentioned, but it is inferred the money was kept in the same bank account; the telephone service was the same; the same janitor service; the same sales slips; the same parcel-wrapping service; the same delivery service; part of the fixtures were owned by the [company]; the credit department was the same for the leased departments and the directly operated departments; the same cash system was used by all departments and staffed by directly employed servants.

"If this defendant was permitted to escape the requirements of the act, then it could be said that a portion of all the services performed directly by certain employees were performed for independent contractors or lessees, whose compensation was included in the percentage received by the [company], and thus we readily see a multitude of confusion would result.

"Unitary businesses can not thus evade the act. Section 19 (f) (2) was enacted for the very purpose of preventing such a plan from having such effect, whether such plan of operation is bona fide or a subterfuge. This section does not mention fraudulent arrangements, and it may be noted here that *Jeffreys-McElrath,* supra, was absolutely honest in its position and plan of operation, but the employees of the sawmillers who went into the woods and cut the standing trees under a contract based upon the number of feet cut were held to be covered under this section. . . The very nature of a department store contemplates the operation of a number of small units. If section 19 (f) (2) means anything, it means that all of the employees making up the whole shall be covered employees, whether they are directly employed through subcontractors, whether we call the contract a lease or business contract or what not.

"For the purposes of clarification, let us consider this illustration: Suppose X went into the automobile business. He has six salesmen, one porter, and two bookkeepers, making him an 'employer and employing unit.' He decides it will be to his advantage to lease out the repair department to another, the lubricating, greasing, and washing department to still another, and enters

into a lease contract with each of them, based upon a percentage of the profits. They are held out to the world as the 'X Auto Company.' X has the right to restrict the lessees to serve only *his customers,* to handle only parts for the cars he sells, to advertise as being the shops or departments of 'X Auto Company.' His office handles all the bookkeeping, cash and credit accounts for the lessees, and he requires the lessees to employ only competent mechanics, and maintain a standard of service in keeping with the policy of his car business. Would one for a moment entertain the idea that these departments were not under a contract for work which is part of his usual business? Section 19 (f) (2) was enacted to cover this very situation. . . It was held in the *Jeffreys-McElrath* decision that the term 'usual business' depends upon whether this class of work was done solely by contractors, or whether directly, so as to be a part of its usual business. It is true that [Union Dry Goods Company] has never operated a shoe department or beauty-shop department directly, but, on the contrary, it has always provided these services to its customers under a lease contract. The same is true in the *Jeffreys-McElrath* case. Reading at page 713: 'Then we have the sawmills, you call it peckerwoods or round mills, that are independently owned. *We do not own any of them.* I am now speaking of our practice from the start of our business back in 1919.' Applying the test as declared by Judge Bell speaking for the Supreme Court, that is, whether the class of work was done solely by contract, or whether a part of it was usually done by the defendant directly, we reach the inescapable conclusion that the operation of the various units in this department store was the very business of the defendant, and that an essential part of the work of the leased departments was not only usually, but consistently done by the defendant directly. Thus, we can reach no conclusion other than the shoe department and the beauty-shop department of the Union Dry Goods Company is a part of its usual business."

As we have heretofore stated, the trial court, under the facts of this case, was correct in his judgment finding that the defendant is an employing unit within the purview of the unemployment compensation act' as defined and set forth under the provisions of Ga. L. 1937, pp. 806, 840, sec. 19 (f) ; Ga. Code Ann., § 54-657 (f), as copied above. . .

■ It may be superfluous to add anything further, but there is one further phase of the evidence that we might, with propriety, discuss, and that is this: The evidence shows that the employees who worked exclusively in the shoe department were five; that the gross sales for a year were $121,000; that the defendant received 11¼ per cent. of the gross sales, or $13,612.50. The manager testified that five per cent. of the gross sales, or $6,050, was a reasonable rental for the space occupied by the shoe department in the company's building. This amount, deducted from the $13,612.50, which the defendant received from the shoe department, leaves a difference of $7,562.50, which was for other services in the shoe department of the lessee. Let us look to the record further. These other services consisted partly of water, heat, and lights. We have no intimation as to the amount of these items. Other services taken care of by this sum of $7,562.50 consist of (a) janitor services; (b) bookkeeping; (c) delivery services; (d) wrapping; (e) credit service; (f) collection service; (g) cashier service; (h) making advancements; (i) accounting services and the like. All of these services were performed for the shoe department by the employees directly under the defendant's management and control. A volume of business producing such a large amount of gross sales is to our way of thinking a rather large business. As to whether or not, if the shoe department now in question had used the $7,-562.50 to supply its own heat, water, lights, and other services, which the defendant furnished to the shoe department, this would have required three additional employees in the shoe department, thereby making eight employees and bringing the shoe department under the provisions of the unemployment compensation act, we are unable to say, from the record. Be this as it may, we have no difficulty in reaching the conclusion that so far as the operation of the shoe department is concerned, Union Dry Goods Company furnished much work from its own employees to carry on this enterprise. In fact, the company furnished the services of their own employees to the extent of $7,562.50, less the value of the lights, water, and heat furnished. Therefore it necessarily follows that the lessees, Stephenson of the shoe department, and Mason of the beauty-shop department, did not exclusively hire and control and direct all of the employees who were necessary to operate such departments.

We may here revert again to the decision of the Supreme Court in *Jeffreys-McElrath Manufacturing Co.* v. *Huiet*, 196 *Ga.* 710 (1 *b*) (supra), wherein the court said: "If the hauling of rough lumber from contractors' mills to the defendant's manufacturing plant was done solely by contractors, none of such work being done by the defendant directly through its own employees, the work so performed by the contractors would constitute no part of the defendant's usual business, within the meaning of such statute." By reference to that case it will be discerned that the Supreme Court reversed the judgment of the lower court in holding that the Jeffreys-McElrath Manufacturing Company was an employing unit regarding the phase of hauling rough lumber, under the provisions of section 19 (f) of the unemployment compensation act of 1937. The facts as to hauling the lumber from the contractors' mills to the defendant's manufacturing plant did not obtain there as here. In the *Jeffreys-McElrath* case no employee of that company rendered any services whatsoever in the operation of hauling rough lumber. Not so in the instant case. The work in the shoe department was not done solely by the five employees of the lessee. Some of such work, a considerable amount of such work—thousands of dollars of such work by reasonable inference—was done by Union Dry Goods Company "directly through its own employees."

The court did not err in overruling the motion for a new trial for any of the reasons assigned.

*Judgment affirmed. Broyles, C. J., and MacIntyre, J., concur.*