## NORTHERN OIL CO. v. INDUSTRIAL COMMISSION et al.

No. 6373.    Decided July 28, 1943.    (140 P. 2d 329.)

354

See 31 C. J. S., Evidence, sec. 183; Am. Jur., Social Security, etc.

*Homer Holmgren,* of Salt Lake City, for plaintiff.

*Grover A. Giles,* Atty. Gen., and *F. F. Dremann* and *A. M. Ferro,* both of Salt Lake City, for defendants.

BRONSON, District Judge.

The Northern Oil Company, a corporation, during the years 1938, 1939 and 1940 was engaged in the business of

drilling an oil well in northern Utah and selling its stock to the public to finance operations. Their selling organization consisted of a General Sales Manager and not to exceed 8 Division Sales Managers operating under the direction and control of the General Sales Manager. The various division managers were required by the company to set up their own sales force. Pursuant to this requirement of the company the division managers organized groups of stock salesmen known, and hereafter referred to herein, as "solicitors." These solicitors operated as follows. Whenever possible they attended sales meetings conducted every morning by the general sales manager, these meetings being also attended by the division managers. During such sales meetings they were informed of the condition of the well, the progress being made in drilling, the prospects of the company in general, given instruction in the methods of approaching a prospect and "warming him up" as a preliminary to the consummation of a sale. The solicitors sought out prospects wherever and at such times as they saw fit, putting as little or as much time into this effort as they desired. Some production was, of course, expected of them. They were furnished with an order book but did not carry any literature or a prospectus of the company, and as they were unlicensed they took no orders. The solicitors invited their prospects to so-called "educational programs" held four nights each week at the company's offices. These meetings were a device to bring the prospect in contact with an employee of the company who would then have an opportunity to close a sale. The division managers are conceded to be employees of the company and they received a commission of 25% upon all sales they made. A portion of the division manager's commission was given to the solicitor whenever a sale was made to a prospect developed by such solicitor. The amount of commission the solicitor received was a matter entirely between the division manager and the solicitor. The general practice was to allow the solicitor a larger commission if he attended the evening meetings with his prospect, arranged

for a meeting with an employee of the company, and was present at the time the sale was closed. One witness testified that she received a commission of 8% upon sales made to her prospects if she was not present, but this was increased to 11% if she was personally present when the sale was consummated. The total amount received from sales of stock was turned into the company by the division manager with information as to the commission the solicitor was to receive. The company then paid the commission directly to the solicitor, usually in cash pay envelopes, the balance of the 25% being paid to the division manager.

This is a review of the action of the Industrial Commission upholding a ruling of the appeal tribunal of the Department of Placement and Unemployment Insurance charging the company with contribution liability on the basis of commissions received by the solicitors during the years in question.

Section 19(j) (1) of the Utah Unemployment Compensation Law, Laws 1936, Sp. Sess., c. 1, as amended by Chap. 52, Laws of Utah 1939, provides:

" 'Employment' * * * means service, * * * performed for wages or under any contract of hire, written or oral, express or implied."

Section 19(p) defines wages as:

" 'Wages' means all remuneration payable for personal services, including commissions and bonuses and the cash value of all remuneration payable in any medium other than cash."

The contribution liability of the company as pertains to the solicitors under the foregoing provision of the act is dependent in the first instance upon the answers to the two following questions: First, were the solicitors rendering personal service? Second, were such services rendered for "wages" as that term is defined in the act?
*Singer Sewing Machine Company* v. *Industrial Commission*, 104 Utah 175, 134 P. 2d 479. The basis for approach and the

technique to be employed in determining the foregoing questions are no longer in doubt in this court. In *Singer Sewing Machine Co.* v. *Industrial Commission,* supra, Mr. Justice Larson has collated and analyzed all previous decisions of this court on the general subject under discussion. We are now committed to the proposition that the act under discussion is remedial, and is a valid exercise of the police powers. Not imposing limitations upon basic rights it is, therefore, entitled to a liberal construction. That the terms "employment," "personal services," and "wages" are much broader in meaning and application than their common law counterparts. That where one rendering services for another for "wages" is under the direction and control of such other, the relationship is a service relationship, although the absence of direction and control does not necessarily exclude the relationship from the operation of the act. That the relationship is to be examined in its broadest aspect on a purely factual basis and the existence of a definite, formal contract is not conclusive in determining whether the relationship is within the act. See, also, *Unemployment Compensation Dept.* v. *Hunt,* Wash., 135 P. 2d 89, decided March 19, 1943. *McDermott* v. *State,* 196 Wash. 261, 82 P. 2d 568. *Sound Cities Gas & Oil Co.* v. *Ryan,* 13 Wash. 2d 457, 125 P. 2d 246. The test then becomes twofold, presenting the two questions above set forth, and if both are found in the affirmative, the relationship is within the act, unless "sifted out" by exceptions hereinafter to be considered. The foregoing principles are applied herein without any elaboration or re-examination of the reasoning in the Singer case and other Utah cases therein discussed.

One of the principal functions of the Northern Oil Company was the sale of its stock to promote its operations. The division managers did not exceed 8 in number. The sales force which they were required by the company to organize made up of the solicitors whose status is under consideration, numbered several hundred. The solicitor's commissions varied, but the record discloses that some received as much as

11% on sales to prospects they brought in contact with the company. There can be but little doubt but what the activities of the solicitors very substantially furthered the business the company was engaged in. It is stipulated that the division managers were "in employment" within the act. Section 19 (h), Chap. 52, Laws of Utah 1939, provides:

"Each individual employed to perform or to assist in performing the work of any agent or *employee* of an employing unit shall be deemed *to be employed by such employing unit* for all the purposes of this act, whether such individual was hired or paid directly by such employing unit or by such agent or employee; provided, the employing unit *had actual or constructive knowledge of the work*." (Italics added.)

Why did the agent allow a solicitor a greater commission when the solicitor was personally present at the consummation of a sale than was allowed otherwise? The answer is obvious. The solicitor was *assisting* the employee of the company in selling the company's stock and for assistance at this point was remunerated. At these meetings between the solicitor, the company's employee, and the prospect; the solicitor it must be presumed, occupied a more advantageous position than the company employee with respect to closing the sale. The prospects were friends and acquaintances of the solicitors, and if not friends and acquaintances were at least individuals who had up to that point placed sufficient confidence in the solicitor, and his representations, to interest themselves further in the affairs of the company. The presence of the solicitor bolstered the company employee in his efforts to close the sale if in fact the employee did more than take the order for stock. It cannot be concluded that the solicitor was given a substantial increase in his commission for being present unless his presence assisted the company employee in performing his work. There can be no question but what the company had actual or constructive knowledge of the work of the solicitors. They required the division managers to create such a sales force, they paid the solicitors directly and through the issuance of stock and payment of commission direct to the solicitors were aware at

all times of the activities of the solicitors in behalf of the company. There is nothing in the record to indicate that the solicitors against the wishes of the division managers could continue to seek out prospects and demand commissions for sales that might thereafter be made to them. There existed in the division managers, and therefore in the company, a right of control, in that the services of the solicitors could be *terminated without incurring liability*. Moreover, the solicitors were not engaged on a particular definite job, but on one the performance of which was continuous and *indefinite* as to them and involved the furtherance of the general business of the company. We are not dealing here with a definite formal contract between the company and the solicitors, as none existed, but we are concerned with the relationship the solicitors bore to the company in fact, and that relationship is to be examined in its broadest aspect. We conclude that the relationship was a service relationship, that the solicitors were rendering services to the company for remuneration or "wages."

They are, therefore, "in employment" within the act unless they are exempted by the concurrence of all the exceptions set forth in section 19(j) (5) (a), (b), and (c) of the act. These exceptions read as follows:

"(5)   Services performed by an individual for wages * * * shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commission that—

"(a)   such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; *and*

"(b)   such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; *and*

"(c)   such individual is customarily engaged in an independently established trade, occupation, profession or business." (Italics added.)

We have already said as much as can fairly be said under subsection (a) relative to the company's control over the solicitors. But whether the evidence of control is weak or

strong there can be no doubt that under subsection (b) service was performed within and in furtherance  of the usual business the company was engaged in. As has been pointed out one of the principal functions of the company was the selling of stock. While the company did not control the place where the original solicitation occurred it did control the place to which the solicitors brought the prospects and the place at which the solicitors were located when the division managers consummated the sales. The sales were closed in the company's offices. With respect to subsection (c) there is no evidence whatever in the record that any of the solicitors were engaged independently in the sale of securities. None of them had licenses permitting them to sell securities, and they were for the most part, farmers and wage earners, earning their livelihood in totally unrelated fields of endeavor. Neither reason, logic or a regard for the policy of the act exclude them from its operation solely because they had other means of livelihood than selling the company's stock. The act makes no distinction between part time or casual employment and full time employment, when the work done is within the business of the employing unit. The commission was correct in finding the solicitors to be "in employment" under the act.

One other question demands disposition. During the period in question certain individuals, including officers of the company, all admitted to be employees, received company stock as remuneration for services rendered. Section 19 (p) defines "Wages" to include

"The cash value of all remuneration payable in any medium other than cash * * * the reasonable cash value of remuneration payable in any medium other than cash * * * shall be estimated and determined in accordance with rules prescribed by the commission."

During the time that such stock payments were made the company was selling its stock at ten cents per share, which was its par value. The company's records disclose that such

payments, to said employees, were made on a basis of ten cents per share. The indebtednes of the company to the various employees was reduced on the books of the company to the medium of dollars, and liquidated by transfer of stock at the rate of ten cents per share. Likewise, the rental of certain tracts of land was paid for in part by the transfer of stock to the owners at the rate of ten cents a share. The Commission in determining the reasonable cash value of the stock thus issued to employees and assessing the company for "wages" paid to employees in stock valuated the stock at ten cents per share. Under Section 10(b) the Commission is required to make findings, which was done. A copy thereof must be furnished the parties. The plaintiff contends vigorously that there is no finding by the Commission that the reasonable cash value of the stock was ten cents per share. It is true that nowhere in the findings does the Commission so find specifically. The duty of the Commission under the act was to determine and estimate the reasonable cash value of the stock in accordance with such rules, reasonably designed to accomplish such purpose, as they themselves should prescribe. From the final order it appears, however, that the Commission did place a valuation of ten cents per share upon the stock and assessed the company accordingly. It must be presumed they found the reasonable cash value of the stock to be ten cents per share and by such process as is authorized by law. If such valuation is supported by evidence, it is conclusive upon this court, not only under general rules relating to review of the findings of administrative tribunals, but by the specific provisions of the act, § 10(i). That the Commission made such valuation, and assessed the company accordingly, seems altogether the equivalent, under the facts in this case of saying in so many words "that the reasonable cash value of the stock is ten cents per share." This is not a situation akin to that in the case of *Salt Lake City* v. *Industrial Commission and Edren D. Erickson,* recently decided by this court, 103 Utah 581, 137 P. 2d 364, wherein the evidence

was in conflict and might support more than one finding, no specific finding being made. Here there is no conflict whatsoever, the evidence is simple, and impels one and only one conclusion. No finding other than the one reflected so clearly in the order of the Commission could possibly have been made. In *Genola Town* v. *Santaquin City*, 96 Utah 104, 85 P. 2d 790, a specific finding was left out under very similar circumstances and the court said,

"It would seem useless to send down a record to have put in black and white such finding which was the only finding which could have been made consistent with the judgment and findings  *  *  * when such finding is before us by necessary implication. This is not the case where a finding is missing which, if supplied, might support a judgment different from that rendered. Where a finding is missing which if supplied would be in harmony with all the other findings and with the judgment and would necessarily be of a definite and obvious import, and could be implied from the other findings, the record will not be sent back merely to supply the omission."

Plaintiff says in its brief, and we quote,

"the undisputed facts show that the company is engaged in a 'Wildcat' oil drilling venture. Its stock has no market or cash value. If there is oil it will be valuable; if there is no oil it will be worthless. There is an entire absence of any basis by which the Department determined or could determine its 'reasonable cash value.'"

But the plaintiff does not claim and could not well be heard to say now that it was selling worthless stock to the public. The stock had some value. While it was not bought and sold freely upon the open market it was being regularly sold to the public under high pressure promotional methods at ten cents per share. It was exchanged as part payment for the rental of lands and it was accepted by emloyees as consideration for services rendered. In these transactions it was accepted by creditors and the employees of the company on the basis of ten cents per share. There is no evidence as to the reasonable cash value of the stock other than the foregoing. How could there be in a business operation of this kind? And what more evidence is required? The com-

pany's assets consisted of what it collected from stock sales, a chance to strike oil, and nothing else. It was a pure gamble and the purchasers of the stock thought the chance worth ten cents per share. The company was willing to sell its stock at ten cents per share. The highest price a purchaser is willing to pay for a commodity, not being under compulsion to buy, and the lowest price a seller is willing to accept, not being under compulsion to sell, is certainly evidence of its reasonable cash value. It is the common method of determining "market value." The company admits that the stock will be worthless if they fail to strike oil. It must be inferred that if the company was successful in striking oil that the shares would increase in value in view of the highly speculative nature of the venture. The *chance* of striking oil had a value to every purchaser of ten cents for each share of the company's stock owned. The evidence could support but one finding, and that is, that the reasonable cash value of the shares was ten cents, and although not specifically made, such finding is clearly reflected in the Commission's order. The order of the Commission is affirmed.

WOLFE, C. J., and LARSON and McDONOUGH, JJ., concur.

MOFFAT, J., does not participate herein.

PRATT, J., on leave of absence.