## JOHANSON BROTHERS BUILDERS et al. v. BOARD OF REVIEW, INDUSTRIAL COMMISSION et al.

No. 7393. Decided October 3, 1950. (222 P. 2d 563.)

(Rehearing denied, Dec. 11, 1950.)

See 48 C. J. S. Joint Adventures, Sec. 1. Joint adventures as distinguished from partnership, note 138 A. L. R. 974. See, also, 30 Am. Jur. 678.

*O. A. Tangren, Elliot Wight,* Salt Lake City, for plaintiffs.

*Clinton D. Vernon*, Attorney General, *Fred F. Dremann*, Salt Lake City, for defendants.

LATIMER, Justice.

Petition to review a decision of the Board of Review, Industrial Commission of Utah, upholding a ruling of the Appeals Tribunal, Department of Employment Security, charging Johanson Brothers Builders and Carl F. Johanson with liability for unemployment contributions for the years 1947 and 1948. Petitioners contend that they were not employers within the provisions of the Utah Employment Security Act, and the amounts distributed to workers by them are not subject to unemployment contributions.

During the year 1946, Carl F. Johanson and one Robert Clayton were employed as mason and mason tender, respectively, by a brick contractor. In early 1947 Johanson started looking for jobs on his own because his employer did not have enough work to keep him steadily employed. Clayton was also working intermittently because of lack of work and Johanson asked if he would work with him on a bricklaying contract which he was seeking to obtain. Johanson applied for and obtained a contractor's license, issued to him in the name of "Johanson Brothers Builders." He explained that at that time his brothers were not associated with him, but he chose that name for the reason that he contemplated organizing a group of several persons as a "brotherhood" to undertake and perform contracts for bricklaying jobs; and that the organization was to function as a cooperative in which all who participated would share in the profits.

In March of 1947 Johanson obtained a contract to perform the bricklaying work on a house. He had Clayton work with him in completing that agreement. Johanson had previously purchased about $200 worth of equipment and this was used to assist in the work. Johanson and Clayton agreed that the money received on the contract

would be distributed as follows: First, Johanson would receive 10 per cent of the amount received for the use of his equipment; second, all costs for materials were to be paid; and third, the remainder would be divided between Clayton and Johanson on a 2 and 3 basis, giving Clayton two-fifths and Johanson three-fifths of the remaining amount. They worked for about six weeks to complete the job and the money received on the contract was allocated in accordance with their agreement.

On the next job, Einar Johanson, a brother of Carl, joined them and some adjustments were made in the division of the proceeds. Subsequently, as other workers joined the group, a so-called "unit system" was established, whereby a worker's share of the proceeds remaining after paying for the materials and the use of the equipment was set in accordance with his experience and ability and the number of workers. According to Johanson, if the group had two or more contracts to perform at one time, each worker received his proportionate share in each job, whether he actually performed labor on all the jobs or not. No payments were made to any of the workers until the money for the contract had been received from the property owner, and in those cases where the money was not collected the workers received no payment.

Many of the workmen engaged by the brotherhood were inexperienced in laying bricks and they received a smaller share than that received by Johanson and some of the more experienced workers. Under the system as planned, the basis of payment for each of the workers was to be discussed and set by the group, but who was to have the final say in the event of a dispute does not appear in the record unless it would be the man who controlled the purse strings. The manner of determining the interest of each worker and the amount to be paid him seemed to be nebulous and was not fully understood by some of the

members. The so-called "unit" had many undisclosed factors and was, in part, established in terms of experience rather than in terms of dollars and cents per hour or day. With new workers joining and others leaving, the gradations of experience were many and the interests fluctuating. Under the plan as testified to the unit of the individual workers would expand and contract from day to day as their efficiency improved and the membership increased or decreased. There was a large turnover of workers in the group and during 1948 at least seventeen different workmen were associated with the organization.

Carl Johanson had the sole authority to make contracts for himself and the association from the time the scheme originated until October, 1948, at which time an oral partnership agreement was entered into between Carl F. Johanson, Einar Johanson and Willard Johanson, Carl's brothers, and Robert Clayton. This agreement was reduced to a written partnership agreement and signed by the four partners on February 15, 1949. Under its terms the agreement assumed the aspects of a legal partnership for those members named above who entered into the contract. By the partnership agreement each of the partners was authorized to make contracts for the partnership, except that contracts or purchases involving a liability of over $1,000 were subject to approval of a majority of the partners; each partner was given the right to discharge an employee, in case any employees were hired; all gains, profits, losses and expenses were to be distributed and borne equally among the partners; and upon Carl F. Johanson was imposed the duty of keeping the books and accounts of the partnership, with each of the partners having the right to free access to the books and accounts. Carl F. Johanson continued to control all money, finances and the payment of obligations.

For the period involved, Carl F. Johanson handled all the

financial details for the organization. He made practically all collections, but occasionally had the help of his brother, Einar. The money received was deposited in the joint personal bank accounts of himself and his wife and was co-mingled with their personal and farm-income funds. He and his wife were the only persons authorized to draw checks on that account. When he drew a check for the organization, he placed a Johanson Bothers stamp on the check and then signed his own name. In this way he attempted to separate the brotherhood funds from his personal funds.

To illustrate the manner of operating and the confusion existing as to the relationship of the workers, we use the experience of two boys. During the summer of 1948, Thayer Christensen, then fifteen years of age, and Talmadge Robinson, seventeen years of age, joined the organization. Neither had any previous experience in the kind of work required. After they had worked about three weeks, they received a check for $75.00, but were told at that time that they were overpaid $35.00. They were working six days a week, from about seven o'clock in the morning until seven o'clock at night, they were uninformed as to how their compensation was determined, and they had nothing to say about how or when they were paid. They had no voice in determining what contracts would be accepted and performed by the organization, or upon which job they would work on any particular day. Einar Johanson had explained the working arrangement to them, but they had little understanding of the scheme they were a part of, as they could not determine how they acquired an interest in a business. These boys worked for the organization from the middle of June until the last of August, 1948, and shortly before the end of the latter month they told Johanson they would like to settle up because it would soon be time to start school. At this time

they were informed by him that the arrangement was a partnership of which they were members, that through this membership they owned one-eighth of the business, and that they would not receive payment for their work on any particular job until the association received its payment from the property owners. After leaving work, they continued asking Johanson for the money which was owed them, and when they failed to receive any payment, they sent a complaint to the State Industrial Commission. They subsequently received a further payment of $50.00.

We assume the complaint of the boys touched off an investigation, as on February 23, 1949, pursuant to an audit by its field advisor, the Division of Insurance notified Carl F. Johanson that a deficiency had been determined against him for failure to make contributions on wages paid by him during the period from January 1, 1947, to December 31, 1948. Johanson filed his objection to the determination and a hearing was held before the Appeals Tribunal. The Appeals Tribunal concluded that the individuals working with Carl F. Johanson up to the time of the establishment of the partnership in October, 1948, were his employees within the meaning of the Utah Employment Security Act, and that the amounts received by them for their labor constituted wages within the provisions of that act; that subsequent to October 1, 1948, the workers were employed by the partnership and the amounts received by them during the period from that date until December 31, 1948, were wages from the partnership. A decision was then entered, holding Carl F. Johanson and the partnership liable for the payment of unemployment contributions on the wages paid. The Board of Review of the Industrial Commission upheld the decision of the Appeals Tribunal, and the plaintiffs petitioned this court for a review of that decision, contending that the relationship between Carl F. Johanson and the workers, and the subsequent relation-

ship between the partnership and the workers, constituted a joint venture, a partnership or some other type of non-contributing status and was not an employee-employer relationship as found by the Commission.

Under the Employment Security Act, Title 42, Chap. 2a, U. C. A. 1943, contributions are assessed and collected from employers, the amount of the contributions being based on the wages paid by the employers to employees. Section 19 of the act contains a glossary of terms used in the act, setting out in detail definitions which govern its application. Under these provisions, an employer is defined as "any employing unit which paid wages during a calendar quarter for employment amounting to $140 or more," Subsection (1) of Section 42—2a—19 (i), U. C. A. 1943, as amended by Chapter 59, Laws of Utah 1947. An "employing unit" is defined as:

"* * * any individual or type of organization, including any partnership, association, trust, estate, joint-stock company, insurance company or corporation, * * * which has or subsequent to January 1, 1935, had one or more individuals performing services for it within this state."

Section 42—2a—19 (h), U. C. A. 1943, as amended by Chap. 59, Laws of Utah 1947.

The plaintiffs do not attempt to catalogue the legal type of organization created by Johanson. They content themselves with saying that it was a partnership, a joint venture or other kind of business which does not subject them to liability under the act.

Section 69—1—3, U. C. A. 1943, defines a partnership as "an association of two or more persons to carry on as co-owners of a business for profit." Section 69—1—15 (5), U. C. A. 1943, provides: "All partners have equal rights in the management and conduct of the partnership business." It does not require a statement of many of the facts in the instant case to establish that the parties did not intend to create the relationship of

partners. At least two of the workmen claimed they did not know they were partners or that they had any rights in the management and conduct of the business. The bank account was carried in the name of Carl F. Johanson and his wife, and no other member had or claimed an interest in the fund. As a matter of fact, the monies paid to Johanson on the contracting business were co-mingled with his farm income in the bank account. No signature of any of the members was honored but that of Mr. Johanson. The equipment all belonged to him, was not transferred to a partnership and the members did not acquire any interest in these capital assets. No one but Johanson could contract for any job. The members were not entitled to share in the profits, equally or on any fixed percentage basis, as their compensation was set by a group and was partly determined by their experience and the number of members participating in the plan; neither were they chargeable with the losses nor permitted to determine the means or the methods of operating the business. The control and direction was either vested in Johanson or in two or three principal operators, certainly not in the beginners and they were not consulted on the details, the methods of operation to be used, the identity of their co-partners, or the results to be accomplished. Moreover, the method of operation negatives a partnership as each time a new workman was employed or was released there was no attempt to settle the affairs and have an accounting of the interest of each. Certaintly, the essential elements of either a general or limited partnership are lacking.

It is illuminating to again refer to the testimony given by a fifteen-year-old boy and seventeen-year-old boy. If the arrangement was one of partnership, they knew nothing about such an arrangement until they concluded to quit and tried to collect payment for their services. Much to their surprise, they were then informed they were partners in the business and that they owned a one-eighth interest,

not in the capital assets, but in the amount to be received from a job. One need not wonder why one of the boys gave the following answer to a question: "We were all partners in business, so he (Johanson )tried to explain to us— but how we could be partners I don't know because we were just working for him."

A joint enterprise has been defined as a "method of operation where there is a community of interest in the objects and purposes of the undertaking and an equal right to direct and govern the conduct of each other with respect thereto, and each enterpriser must have some voice and right to be heard." Black's Law Dictionary, 3rd Ed.

Tested by that definition there can be no question but that this was not a joint enterprise. The principles mentioned above for a partnership are in part applicable to a joint enterprise and the facts of this case show that most of the workers did not have any voice in the control or management of the venture; they merely performed their work as directed. The plan contemplated using individuals who had little, if any, training in the trade and having them work as apprentices, not as joint venturers. Their rate of pay or participation in the profits when starting was meager and while it may have increased with experience it bore no relationship to any interest which they may have had in the venture. The amount may have been influenced by the number of participants, but Johanson and two or three older members usually determined the rate.

In view of the claim by appellants that assuming the arrangement was not a partnership or joint venture, it was not such a status as would make them liable, we refer to the statutory provision to determine their liability. Section 42—2a—19 (j) (5), U. C. A. 1943, as amended by Chap. 59, Laws of Utah, 1947, provides:

"Services performed by an individual for wages or under any contract of hire, written or oral, expressed or implied; shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commission that—

"(A) such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of hire and in fact; and

"(B) such service is either outside the usual course of the business for which such service is performed or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

"(C) such individual is customarily engaged in an independently established trade, occupation, profession, or business of the same nature as that involved in the contract of service."

Controversies regarding the interpretation and application of the above-quoted section have been before this court on several occasions. The general rules announced by this court in determining employer-employee, independent contractor or other relationships can be found in *Singer Sewing Machine Company* v. *Industrial Commission et al.*, 104 Utah 175, 134 P. 2d 479, petition for rehearing denied 104 Utah 196, 141 P. 2d 694; *Globe Grain & Milling Company* v. *Industrial Commission et al.*, 98 Utah 36, 91 P. 2d 512, petition for rehearing denied 98 Utah 48, 97 P. 2d 582; *Creameries of America* v. *Industrial Commission et al.*, 98 Utah 571, 102 P. 2d 300; *Fuller Brush* v. *Industrial Commission of Utah et al.*, 99 Utah 97, 104 P. 2d 201, 129 A. L. R. 511; and *Northern Oil Company* v. *Industrial Commission et al.*, 104 Utah 353, 140 P. 2d 329.

We do not quote from the cited cases for the reason that the provisions of the quoted section are sufficient to establish that the plaintiffs were subject to the act. The section provides that services performed by an individual for wages or under any contract of hire shall be deemed employment. The workers could not have been self-employers. The labor performed by them was on contracts obtained at first by Johanson and later by

the partnership. The workers had no authority to undertake contracts for themselves or for the group, and they had no authority to reject any proposed contract. They were permitted to use the equipment of Johanson and upon termination of their status they had no interest in any of the equipment, in any assets, or in any of the contracts entered into. Their work was performed under an arrangement whereby Johanson obtained benefits from their services in that he received a substantial payment for the use of his equipment before the workers received any pay. The workers had no contracts with the owner of the property and they looked to Johanson for payment for their services. He directed the method of performance and he controlled the equipment, funds, financial and administrative matters necessary to operate the business and the workers were in every sense performing services for him.

Furthermore, if we test the relationship by the exclusions set forth in the quoted paragraph, we find that the services performed by the workers cannot be excluded. The subsections are conjunctive and the wording requires that tests prescribed by all three must be met before the relationship can be excluded. From what has previously been said it is evident that the individual workers were not "free from control or direction over the performance of such services" as required by subsection (A) of that section. Hence, we need not discuss whether plaintiffs could be excluded from liability under the other provisions.

It may be, as contended by plaintiffs, that the plan was conceived and operated in the best of faith and was not created for the purpose of avoiding social security payments, unemployment compensation payments, workmen's compensation payments, and other legitimate charges levied against employers. However, the claim of good faith cannot be used to escape the obligations imposed by statute. If a plan of operation is devised which

the creators believe will exclude them from the statute there is no reason why the Department of Employment Security cannot look behind the plan or scheme and determine the actual relationship. If it is found that the plan does not accomplish its purpose and that contributions are due because of the method of operation, then they must be paid regardless of the motives of the creator.

We are convinced the facts of this case show that the employees were rendering personal services for Johanson and the partnership and that the Department was not in error when it required payment of the amounts found due.

The order of the Commission is affirmed.

WOLFE and McDONOUGH, JJ., concur.

WADE, Justice (concurring in part—dissenting in part). I do not think that Carl F. Johanson, Contractor, as an individual, was ever an employer of the other persons who worked with him in the contracting business. Up to the time the partnership was formed I think there was a joint enterprise between him and all of his associates with the possible exception of the teen-age boys. The evidence seems to be without dispute that when Johanson and Clayton commenced to work together, Johanson was not employer of Clayton, but they were associated together in a joint enterprise, and therefore as long as there were no others working with them they owed no contributions under the Utah Employment Security Act. I think this was also true after others joined them under the same arrangements as long as the others participated in the management of the business and fully understood the nature of their arrangements. From the evidence, there is doubt that these teenage boys understood the nature of these arrangements or participated in the management of the business and therefore the Commission had sufficient evidence from which it could find that these boys were employed not by Carl F. Johanson, but this association.

After the partnership was formed, of course, the partnership became the employer of all the persons who worked for it who were not members. But Carl F. Johanson individually was not then the employer of the other members nor of the other workmen.

PRATT, Chief Justice (dissenting).

Was Carl F. Johanson, Contractor, an employer in 1947-1948 under the Utah Employment Security Act? That is the issue of this case, and it arose in this way: Mr. Johanson received notice from the chief of the Division of Insurance of the Department of Employment Security, assessing him with a deficiency contribution on unreported wages for the years of 1947-1948. Interest and penalty were also assessed.

The foundation for this claimed deficiency is this: In the early part of 1947, Carl F. Johanson and one Robert Clayton deciding to work together as a "brotherhood," took out a contractor's license as "Johanson Brothers Builders." They took building work upon which Johanson acted as bricklayer and Clayton as mason tender. Johanson borrowed $250.00 from his brother and bought equipment. Out of the proceeds of jobs, 10 per cent was deducted to pay for equipment and the balance was divided upon a 3-2 basis. As Clayton became more experienced in brick work, they divided 50-50. They agreed that if others were asked to work with them, they would be taken in on a share-in-the-profits basis. Others were taken in on that basis, the person's ability and experience governing the percentage he would draw for his share. Each would share in the profits of all the work, though he might not participate in all jobs. At one time they took in two teen-age boys who thought they were employees, but who admitted they were not paid a regular wage, but received money when received by the builders; and to whom it was explained that they were

getting a percentage of what came in. Apparently, the prevailing opinion is very much influenced by the taking in of these boys. No doubt, had the Johansons been lawyers, they would have been more legalistic in their reasoning and made certain that the boys understood the setup. However, being working men, we have to judge their actions by the efforts they expended to carry out a certain plan of joint working arrangements; rather than measuring their actions by what we of the legal profession know should have been done to avoid a change-of-heart on the part of the Industrial Commission.

The group agreed by voice vote how long they should work. When asked what they would do if a member proved to be lazy, Johanson said they would have to do his work, but they would not discharge him. However, he denied having any such experience. They voted upon whom should be taken into the organization. Some who were taken in were inexperienced, and their share was small at first; but as they learned and increased in ability, their share was increased. Johanson was paid an extra percentage for such of his own equipment as was used. No one coming in contributed any funds to the group enterprise. They contributed only their labors, but they shared in the profits earned by all. The funds from which each share was drawn were kept in the bank account of Carl F. Johanson; and he issued the checks. He made no effort to, nor did he indicate he would turn any of the equipment used as his, over to the group, as a partnership.

There is no contention in this case that this form of group enterprise was entered into to avoid the Employment Security Law. In fact, when it first started, Mr. Johanson consulted a representative of the commission, who informed him that he would not have to make contributions; and the decision of the Appeals Tribunal indi-

cates that belief of the group that contributions were not due was honestly and reasonably justified.

In October, 1948, a partnership was formed and on February 15, 1949, a written partnership agreement was drawn up and signed by the then members of the organization, who were Carl Johanson, two of his brothers, Willard and Einar, and Robert D. Clayton. Some of the provisions of that agreement are: that all contracts for $1000 or more shall be made only after consultation with other members, and approval by a majority; profits were to be equally divided between the partners and Carl was to keep the books and the partners were to furnish him the necessary data about contracts and work. There were other provisions; but the over-all picture of the functioning of the organization after the partnership agreement, was but slightly different from what was before. There is little or no dispute between the parties as to the facts recited above. Do these facts show that Carl F. Johanson was an employer?

The commission has invited our attention to Section 42—2a—10 (i), U. C. A. 1943, which reads:

"* * * In any judicial proceeding under this section the findings of the commission and the board of review as to the facts as supported by evidence shall be conclusive and the jurisdiction of said court shall be confined to questions of law. * * *"

They contend that as this question is one of fact, we are bound by the administrative tribunal findings of fact. I do not think that defendants have properly applied that section. What has been said above of the facts of this case, is not a listing of evidence pro and con upon the question, with a conclusion of fact found by the Board of Review. There is little or no controversy about the facts we have recited. The question is: Do these facts in the eyes of the law establish Carl F. Johanson to be an employer? I think not.

It seems clear from these facts that the parties were

trying to establish some sort of a joint enterprise, into which each would put his services and out of which he would get a percentage of the profits. Each was to have his voice upon the manner of conducting the business as well as what business should be taken. Naturally, the more experienced members would direct and instruct the less experienced in what to do or not to do. This direction was consistent with the purpose of accomplishing the results desired for the benefit of all. It did not exclude that idea and point solely to the relationship of employer-employee.

In the very recent case of *Powell* v. *Industrial Commission* 116 Utah 385; 1950, 210, P.2d 1006, we said that the first question for us to determine was that of whether or not a "service relationship" existed between Powell and his lessees; —in the present case, between Carl F. Johanson and the others who joined him in this work. If we should find that this service relationship did exist, then they are employees unless they fall within the provisions of Section 42—2a—19 (j) (5) (A) (B) and (C). We said in that case that we must look behind the contract to the actual situation.

What picture do we see when we look behind the contract in this case? We have a group of men, which group varies in personnel and size from time to time, trying to accomplish that which is usually done by those whom we ordinarily designate as building contractors. This group of men is made up of those we would usually find as employees of the building contractor doing for him the detailed work of such employees—but in this case, for whom? For an employer? For just one of them? No, for each and all of them. Each has his voice in the determination of the kind of work to be done, and how it should be done. Each shares in the profits of the work of all. If one quits, then, as he is not contributing any more to the services of all, he re-

ceives a share in that to which he has contributed. It seems a very reasonable conclusion at which to arrive, to say that they felt that if the contracting business was sufficiently lucrative to engage the interest of a contractor to the extent that he would employ others to perform the detail work for him and still make a profit, why could they not eliminate that employment status, and become the contractors themselves and have the benefit of the total amount that would go to make up salary and profit. It is such a conclusion that appears to have been the goal of this little enterprise. The joint control, in conjunction with the sharing of profits, are the outstanding features of the association that lead me to the belief that the "service relationship" does not exist in this set-up.

The decision of the commission should be vacated and set aside.