257 F.2d 920
 79 A.L.R.2d 668
 UNITED STATES of America, Appellant,
v.
Bill HATAHLEY, Widow Sleepy, Charlie Burke, Lucy Harvey,
Shorty Smiles, Notona Begay, Mark Tootsonian, Mary Jay, John
Jay, Frank Joe, Danny Jones, Jim Antez, Cyrus Begay, Allen
Ben, Willie Harvey, Tom Jones, Hosteen Sakezzie, Fred
Johnson, Jim Hatahley, Billie Antez, Little Wagon, Tom
Mustash, Slim Todachennie, Mary's Boy, Eddie Nocki, Susie
Sleepy, Mrs. Lilly Thomas, Jim Harvey, Tom's Father, and Tom
Belatso, Appellees.
 No. 5717.
 United States Court of Appeals Tenth Circuit.
 July 11, 1958.
 
 Harold S. Harrison, Atty., Dept. of Justice, Washington, D.C. (Perry W. Morton, Asst. Atty. Gen., A. Pratt Kesler, U.S. Atty., Salt Lake City, Utah, Llewellyn O. Thomas, Asst. U.S. Atty., Salt Lake City, Utah, and Roger P. Marquis, Atty., Dept. of Justice, Washington, D.C., were with him on the brief), for appellant.
 Dennis McCarthy, Salt Lake City, Utah (Milton A. Oman, Salt Lake City, Utah, was with him on the brief), for appellees.
 Before BRATTON, Chief Judge, and MURRAH, PICKETT, LEWIS and BREITENSTEIN, Circuit Judges.
 PICKETT, Circuit Judge.
 
 
 1
 This case is before us for the second time. It was brought by the plaintiffs, who are Indians of the Navajo tribe, under the provisions of the Federal Tort Claims Act (28 U.S.C.A. 1346(b) and 2671 et seq.), to recover $100,000 as damages for the loss of horses and burros which they allege were wrongfully and unlawfully seized and destroyed in the State of Utah by agents of the United States Bureau of Land Management. The trial court found for the plaintiffs and entered a lump sum judgment of $100,000. We reversed on the grounds that the horses and burros in question had been lawfully seized and disposed of under the Utah 'abandoned horse' statute. Utah Code Ann.1953, Title 47, Chapter 2. We did not consider the question of liability under the Federal Tort Claims Act, or the sufficiency of the findings as to damages. United States v. Hatahley, 10 Cir., 220 F.2d 666. The United States Supreme Court reversed, and held that the provisions of the Federal Range Code must be complied with before local procedures may be resorted to for the removal of trespassing livestock from the public range. It was also held that the acts of the government agents 'were wrongful trespasses not involving discretion', which gave rise to a claim compensable under the Federal Tort Claims Act. The case was remanded for specific findings as to damages. Hatahley v. United States, 351 U.S. 173, 76 S.Ct. 745, 752, 100 L.Ed. 1065.[1] The factual background is set forth in our former opinion and that of the Supreme Court, and need not be repeated here.
 
 
 2
 Upon remand, the District Court took additional evidence on the issue of consequential damages, and without an amendment of the complaint, entered a judgment against the United States for the total sum of $186,017.50. The value of each horse or burro taken was fixed at $395; each plaintiff was awarded $3,500 for mental pain and suffering; and damages were given for one-half of the value of the diminution of the individual herds of sheep, goats and cattle between the date the horses and burros were taken in 1952, and the date of the last hearing in 1957. Except as to those relating to specific damages for each plaintiff, the findings of fact are generally a resume of the evidence favorable to the plaintiffs, and inferences which the court thought could be reasonably drawn therefrom. The United States contends that there were numerous errors in rejecting evidence, limiting cross-examination, and in disregarding fundamental principles of law. It vigorously insists that there has not been a fair and impartial trial as to damages, and that one cannot be obtained except before another Judge.
 
 
 3
 The parties stipulated as to the number of horses and burros which were taken from each plaintiff in the range clearance program. The damage for this wrongful taking is to be determined by the law of Utah. In Egelhoff v. Ogden City, 71 Utah 511, 267 P. 1011, 1016, the Supreme Court of Utah, in discussing the rule as to damages in a case of this kind, said:
 
 
 4
 '* * * Appellant contends that the measure of damages in this case is the difference between the market value of the property immediately before and immediately after the injury. It may be conceded that such is the proper measure of damages. It has been held by this court that the measure of damages for the destruction of a house is the 'cost to reproduce it, and the value of its use while that was being done.' Marks v. Culmer, 6 Utah 419, 24 P. 528.'[2]
 
 
 5
 Cf. Angerman Co., Inc., v. Edgermon, 76 Utah 394, 209 P. 169, 79 A.L.R. 40. (Personal property not entirely destroyed). In a recent case the Utah court applied the replacement rule where personal property (poultry) was destroyed. Park v. Moomay Mfg. Co., 121 Utah 339, 241 P.2d 914, 40 A.L.R.2d 273. See, also, Haycraft v. Adams, 82 Utah 347, 24 P.2d 1110; Bergstrom v. Mellen, 57 Utah 42, 192 P. 679; Metcalf v. Mellen, 57 Utah 44, 192 P. 676. Cf. Egelhoff v. Ogden City, supra.
 
 
 6
 The fundamental principle of damages is to restore the injured party, as nearly as possible, to the position he would have been in had it not been for the wrong of the other party. Hill v. Varner, 4 Utah 2d 166, 290 P.2d 448; Park v. Moorman Mfg.Co., supra.[3] Applying this rule, the plaintiffs were entitled to the market value, or replacement cost, of their horses and burros as of the time of taking, plus the use value of the animals during the interim between the taking and the time they, acting prudently, could have replaced the animals.
 
 
 7
 The plaintiffs did not prove the replacement cost of the animals, but relied upon a theory that the animals taken were unique because of their peculiar nature and training, and could not be replaced. The trial court accepted this theory, and relying upon some testimony that a horse or a burro could be traded among Indians for sheep, goats or cattle worth a stated price, together with the owner's testimony of the value, arrived at a market value of $395 per head. No consideration was given to replacement cost. The court rejected evidence of the availability of like animals in the immediate vicinity, and their value. This, we think, was error. It is true that animals of a particular strain and trained for a special purpose are different from animals of another strain and not so trained, but that does not mean that they cannot be replaced by animals similarly developed and trained, or which may be trained after acquisition. Ordinarily every domestic animal is developed and trained for the purpose to which the owner intends to use it. This development and training adds to its usefulness and generally increases the market value of the animal. In arriving at a fair market value of destroyed animals, the court should considered evidence of the availability of like animals, together with all other elements which go to make up market value. In proper instances, parties and witnesses may be cross-examined on the subject.
 
 
 8
 Likewise, we think the court applied an erroneous rule, wholly unsupported by the evidence, in arriving at the amount of loss of use damage. There was testimony by the plaintiffs that because of the loss of their horses and burros they were not able to maintain and look after as much livestock as they had been able to before the unlawful taking, consequently the size of their herds was reduced. If the unlawful taking of the animals was the proximate cause of the herd reductions, the measure of damages would be the loss of profits occasioned thereby. 25 C.J.S. Damages 42 and 44.
 
 
 9
 Applying the same formula to all plaintiffs, the court, without giving consideration to the condition, age or sex of the animals, found the value of the sheep and goast in 1952 to be $15 per head, the cattle to be $150 per head. The number of sheep, goats and cattle which each plaintiff had in 1952, as well as the number which each had at the date of the last hearing was established. This difference was multiplied by $15, in the case of sheep and goats, and by $150, in the case of cattle, and judgment was entered for one-half of the amount of the result. No consideration was given to the disposition of the livestock by the plaintiffs in reducing the herds. For example, the plaintiff Sakezzie had 600 sheep and goats and 101 head of cattle when his horses and burros were taken in 1952. At the date of the last hearing in 1957, he had 160 head of sheep and goats and 39 head of cattle. The dollar value of the difference at $15 per head for the sheep and goats, and $150 per head for the cattle, amounted to $15,900. The court found 'that approximately fifty percent of this amount represents damages to the plaintiff proximately caused by deprivation of the use of plaintiff's horses, and on this basis plaintiff is entitled to recover $7,950.00 as consequential damages resulting from such deprivation'. The result, insofar as it related to use damage, was arbitrary, pure speculation, and clearly erroneous. In United States v. Huff, 5 Cir., 175 F.2d 678, a case where the method of computing damages for loss of sheep and goats was strikingly similar to that used here, the court said:
 
 
 10
 'Moreover, there has been no sufficient showing of how much of the damage from the loss of the sheep and goats was proximately caused by the Government's failure to maintain and repair the fences under the lease, and how much of the damage resulted from the various other causes. There is no testimony whatever as to the specific dates of loss of any of the sheep and goats, or as to their age, weight, condition and fair market value at the time of the alleged losses. It therefore becomes patent that the evidence as to the loss of these animals in each case fails to rise above mere speculation and guess.' 175 F.2d 680.[4]
 
 
 11
 Plaintiffs' evidence indicated that the loss of their animals made it difficult and burdensome for them to obtain and transport needed water, wood, food, and game, and curtailed their travel for medical care and to tribal council meetings and ceremonies. Plaintiffs also testified that because of the loss of their animals they were not able to grow crops and gardens as extensively as before. These were factors upon which damages for loss of use could have been based. This does not exclude the right to damages for loss of profits which may have resulted from reduction of the number of livestock, or actual loss of the animals, if the unlawful acts of the defendant agents were the proximate cause of the loss and were proved to a reasonable degree of certainty. United States v. Griffith, Gornall & Carman, Inc., 10 Cir., 210 F.2d 11; Telluride Power Co. v. Williams, 10 Cir., 172 F.2d 673; Orient Min. Co. v. Freckleton, 27 Utah 125, 74 P. 652. But the right to such damages does not extend forever, and it is limited to the time in which a prudent person would replace the destroyed horses and burros. The law requires only that the United States make full reparation for the pecuniary loss which their agents inflicted.
 
 
 12
 The District Court awarded each plaintiff the sum of $3,500 for mental pain and suffering. There is no evidence that any plaintiff was physically injured when his horses and burros were taken. There was evidence that because of the seizure of their animals and the continued activity of government agents and white ranchers to rid the public range of trespassers, the plaintiffs and their families were frightened, and after the animals were taken, they were 'sick at heart, their dignity suffered, and some of them cried'. There was considerable evidence that some of the plaintiffs mourned the loss of their animals for a long period of time. We think it quite clear that the sum given each plaintiff was wholly conjectural and picked out of thin air. The District Court seemed to think that because the horses and burros played such an important part in the Indians' lives, the grief and hardships were the same as to each. The equal award to each plaintiff was based upon the grounds that it was not possible to separately evaluate the mental pain and suffering as to each individual, and that it was a community loss and a community sorrow.[5]
 
 
 13
 Apparently the court found a total amount which should be awarded to all plaintiffs for pain and suffering, and divided it equally among them. There was no more justification for such division than there would have been in using the total value of the seized animals and dividing it equally among the plaintiffs. Pain and suffering is a personal and individual matter, not a common injury, and must be so treated. While damages for mental pain and suffering, where there has been no physical injury, are allowed only in extreme cases, they may be awarded in some circumstances. Restatement of the Law of Torts, 46, 47; State v. Baltimore Transit Co., 197 Md. 528, 80 A.2d 13, 28 A.L.R.2d 1062, and the cases collected at 28 A.L.R.2d 1070, et seq. See, also, Lambert v. Sine, 123 Utah 145, 256 P.2d 241. Any award for mental pain and suffering in this case must result from the wrongful taking of plaintiffs' animals by agents of the United States, and nothing else.
 
 
 14
 As the case must be remanded for a new trial as to damages, we are confronted with the contention of the United States that it cannot obtain a fair and impartial trial before the same Judge because of his personal feelings in the matter. In our former opinion we had occasion to make some observations concerning the conduct of the trial. The Supreme Court referred to these observations on the bias and prejudice of the presiding Judge, and said that the trial was not so improperly conducted as to vitiate the findings. This statement did not relate to any of the findings as to damages which are under consideration here. A casual reading of the two records leaves no room for doubt that the District Judge was incensed and embittered, perhaps understandably so, by the general treatment over a period of years of the plaintiffs and other Indians in southeastern Utah by the government agents and white ranchers in their attempt to force the Indians onto established reservations. This was climaxed by the range clearance program, with instances of brutal handling and slaughter of their livestock, which the Court, during trial, referred to as 'horrible', 'monstrous', 'atrocious', 'cruel', 'coldblooded depredation', and 'without a sense of decency'. The Court firmly believed that the Indians were being wrongfully driven from their ancestral homes, and suggested Presidential and Congressional investigations to determine their aboriginal rights. He threatened to conduct such an investigation himself. A public appeal on behalf of the plaintiffs was made for funds and supplies to be cleared through the Judge's chambers.[6] From his obvious interest in the case, illustrated by conduct and statements made throughout the trial, which need not be detailed further, we are certain that the feeling of the presiding Judge is such that, upon retrial, he cannot give the calm, impartial consideration which is necessary for a fair disposition of this unfortunate matter, and he should step aside.
 
 
 15
 Plaintiffs' claims are asserted under the Federal Tort Claims Act. In applying this Act, everyone should be treated the same. Racial differences merit no concern. Feelings of charity or ideological sympathy for the Indians must be put to one side. The deep concern which the executive and legislative branches of the government should have for the plaintiffs does not justify the court in giving them any better or worse treatment than would be given to anyone else. As Justice Jackson said in his concurring opinion in Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, 355, 65 S.Ct. 690, 700, 89 L.Ed. 985: 'The Indian problem is essentially a sociological problem, not a legal one. We can make only a pretense of adjudication of such claims, and that only by indulging the most unrealistic and fictional assumptions.'
 
 
 16
 Somewhat in analogy to the procedure outlined in Cooke v. United States, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767, and Offutt v. United States, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11, we suggest that when the case is remanded to the District Court, the Judge who entered the judgment take appropriate preliminary steps to the end that further proceedings in the case be had before another Judge. See La Buy v. Howes Leather Co., 352 U.S. 249, 259, 77 S.Ct. 309, 1 L.Ed.2d 290.
 
 
 17
 Reversed, and remanded for a new trial as to damages only.
 
 
 
 [1]
 In referring to damages, the Supreme Court said: 'The District Court awarded damages in the lump sum of $100,000, the amount sought by petitioners jointly. Apparently this award was based on the value of the horses, consequential damages for deprivation for use and for 'mental pain and suffering.' Under the Federal Tort Claims Act, damages are determined by the law of the State where the tortious act was committed, 28 U.S.C. 1346(b), 28 U.S.C.A. 1346(b), subject to the limitations that the United States shall not be liable for 'interest prior to judgment or for punitive damages.' 28 U.S.C. 2674, 28 U.S.C.A. 2674. But it is necessary in any case that the findings of damages be made with sufficient particularity so that they may be reviewed. Here the District Court merely awarded the amount prayed for in the complaint. There was no attempt to allot any particular sum to any of the 30 plaintiffs, who owned varying numbers of horses and burros. There can be no apportionment of the award among the petitioners unless it be assumed that the horses were valued equally, the burros equally, and some assumption is made as to the consequential damages and pain and suffering of each petitioner. These assumptions cannot be made in the absence of pertinent findings, and the findings here are totally inadequate for review. The case must be remanded to the District Court for the appropriate findings in this regard.' 351 U.S. 182, 76 S.Ct. 752
 
 
 [2]
 As a general rule, market value is the highest price a purchaser is willing to pay for property, not being under compulsion to buy, and the lowest price a seller is willing to accept, not being under compulsion to sell. Vol. 26A Words and Phrases Market Value p. 66; Northern Oil Co. v. Industrial Commission, 104 Utah 353, 140 P.2d 329; A. & A. Tool & Supply Co. v. Commissioner of Internal Revenue, 10 Cir., 182 F.2d 300
 
 
 [3]
 Restatement of the Law of Torts, Section 912, states the rule as follows: 'A person to whom another has tortiously caused harm is entitled to compensatory damages therefor if, but only if, he established by proof the extent of such harm and the amount of money representing adequate compensation with such certainty as the nature of the tort and the circumstances permit.'
 
 
 [4]
 In Graham v. Street, 2 Utah 2d 144, 270 P.2d 456, the Supreme Court of Utah said:
 'The rule is stated in 4 Sutherland, Damages, 4th Ed., Sec. 1175, as follows: 'Only such damages are recoverable as are shown with reasonable certainty to have been sustained. Remote, contingent and conjectural losses will not be considered.' * * *' 270 P.2d 459.
 
 
 [5]
 The court's finding on this subject is as follows:
 '28. It is not possible for the extent of the mental pain and suffering to be separately evaluated as to each individual plaintiff. It is evident that each and all of the plaintiffs sustained mental pain and suffering. Nor is it possible to say that the plaintiffs who lost one or two horses sustained less mental pain and suffering than plaintiffs who lost a dozen horses. The mental pain and suffering sustained was a thing common to all the plaintiffs. It was a community loss and a community sorrow shared by all. On this basis, the Court finds and awards the sum of $3,500.00 to each of the plaintiffs as a fair and reasonable approximation of the mental pain and suffering sustained by each, as a proximate result of the taking of the horses by the defendant.'
 
 
 [6]
 The allowance of $395 per head for the Indian horses and burros, and $3,500 for mental pain and suffering for their loss, is of itself an indication of the desire of the presiding Judge to assist the plaintiffs for the different wrongs which they had suffered